INHABITANTS<br>v.<br>NEW ORLEANS.

The canal does not, however, appear to be a nuisance in the legal sense of the word. It is intended for a drain, and it is necessary that canals should exist for the purposes of drainage. Offensive things may occasionally be thrown in, but this is inevitable, in a large city, in despite of the prohibitions of ordinances. If plaintiffs considered the canal a nuisance, they ought not to have purchased along its sides, for it has been in its present condition for twenty-one years and more.

It is, therefore, ordered, adjudged and decreed, that the judgment be avoided and reversed; that there be judgment in favor of defendant against the demand of plaintiffs, and that plaintiffs pay the costs of both courts.

---

## REUBEN SLEADE et al. v. PAYNE & HARRISON.

In order to relieve the owners of vessels from responsibility, there must be a delivery on the wharf to some person authorized to receive the goods, or some act must be done, which is an equivalent to a delivery.

In order to constitute a delivery, there must be a notice given to the consignee, and a reasonable time given him to make the usual and necessary preparations to receive the goods.

The manner of delivering the goods, and consequently the period at which the responsibility of the master and owners will cease, depend upon the customs of particular places, and the usage of particular trades.

APPEAL from the Fifth District Court of New Orleans, *Eggleston, J. Singleton & Clack*, for plaintiffs and appellants. *P. E. Bonford*, for defendants.

COLE, J. Plaintiffs instituted this suit for the recovery of freight on cotton consigned to the defendants, whereupon the latter reconvened, claiming the value of five bales of cotton, which, they allege, plaintiffs failed to deliver to them.

There was judgment in favor of plaintiff for the freight, and against him on the reconventional demand. He has appealed.

In order to relieve the owners of vessels from responsibility, there must be a delivery on the wharf to some person authorized to receive the goods, or some act which is equivalent to, or a substitute for it. 3 La. 226, *Kohn & Bordier v. Packard; The Salmon Falls Manufacturing Company v. The Bark Tangier*, American Law Reg., June number, 1858, p. 505; Parsons on Contracts, 1 vol., pp. 670, 671, Note C. and p. 673; *Northern v. Williams, Phillips & Co.*, 6 An. 579.

In order to constitute the delivery, it is not sufficient to unload the vessel and place the goods upon the wharf; there must also be a reasonable notice to the consignee, giving him time to make the usual and necessary preparations to receive the goods. The manner of delivering the goods, and consequently the period at which the responsibility of the master and owners will cease, depend upon the custom of particular places, and the usage of particular trades. Abbott on Shipping, p. 378; Amer. Law Reg. p. 507.

There was not, in the present case, such a delivery as to relieve the boat from liability.

The only notice given, except so far as the consignees were aware of the consignment by the newspapers and their own bills of lading, was to *Mike Hynes*, the receiving clerk of the press, where *Payne & Harrison* store their cotton. It is not shown that the latter saw the notice in the papers of the arrival of the

boat and the names of the consignees, or that they received any bill of lading for the cotton now in contestation.

Conceding that notice to *Hynes* would have sufficed, on the ground that he was the agent for such purpose of the consignees, still a reasonably sufficient time did not elapse between the notice and the disappearance of the five bales of cotton, to liberate the common carrier from liability for their loss.

The consignee is not obliged to accept delivery of goods at the moment he is informed they are ready for delivery, but is entitled to a reasonable time for pre-paring to carry them away. Particularly must such be case in a port like that of New Orleans, with reference to steamboats. Several of these often arrive at once, with large consignments to the same house. If all goods were at their risk at the moment they were informed they were ready for delivery, it would work a serious inconvenience.

On Saturday afternoon, about sundown, *Hynes* went and asked *Hodgson*, who was employed to discharge the steamboat, if he had any cotton for him. It thus appears that the boat had given him no direct notice, until he went to inquire personally.

*Hodgson* showed him the cotton of defendants, and asked him to take it away. He replied, that he had but four drays and could take only twenty bales that evening. *Hynes* took twenty bales away at that time.

From the evidence of the plaintiff's own witness, it was about sundown, when he informed *Hynes* the cotton was ready for delivery.

If *Hynes* had not taken away any of the cotton, the boat could not have com-plained, because he was notified at the time when the business of the day was about closing.

The next day was Sunday; *Hynes* was not obliged to take them away on that day, for it is considered a day of rest. If this could be considered a delivery, then there would be no safety for the commercial community. The agent of a boat might notify the consignee in the night or on Sunday, that his goods were ready for delivery, but at such times it is almost impossible to procure laborers, and the goods would be exposed to be stolen and to be injured by the weather.

It is true that the boat binds itself to deliver the goods at the port of New Orleans to the consignee, but this contract, like every other, must be supposed to impose upon the boat the obligation of carrying out its contract in such a way, that the spirit of the contract may not be violated.

The obligation of delivering the goods to the consignee, carries with it that of delivering them at such time that the consignee can get laborers to haul them away, and not at midnight, on Sunday, or some other day of public rest. It is the duty of the boat to exercise a watch over the goods, after notice is given at a proper moment, for the time which is reasonably necessary for hauling them away.

After the expiration of this reasonable time, if sickness or any accident pre-vents the hauling away of the goods, the boat is no longer liable as a common carrier, but as a bailee on deposit.

At eleven o'clock on Monday morning the remainder of the cotton was still upon the wharf. *Hodgson* at that time saw *Hynes* taking away cotton that had arrived by another boat. *Hodgson* went to *Hynes* and asked him to give him a receipt for the cotton, if he did not intend to haul it. He answered, he would be down directly and haul it way. He declined giving a receipt. At two o'clock, upon the same day, (Monday,) *Hynes* was there to carry away the cotton, but could only find one bale, five being missing.

As notice was first given on Saturday night, and a day of rest intervened between them and Monday, the notice may be considered to have been given on early Monday morning, that the cotton was ready for delivery. *Hodgson* testifies, that it is a custom to keep a watch on cotton until it is hauled away. His asking for a receipt shows that he did not consider it as delivered. He says, that he put a watchman over the cotton on Sunday night "*as usual*," and that he always takes a receipt from the receiving clerk for cotton.

*Hynes* testifies it was 12 M., on Monday, when *Hodgson* told him he had the six bales, being the remainder of the shipment, ready for him. *Hodgson* wished him to give him a receipt for them and to take his word they were there; this deponent declined to do, but told him as soon as the drays returned, he would receive them. As soon as the drays returned, deponent sent for the six bales. The discharging clerk, *Hodgson*, then told him there was but one bale to be found; deponent took that bale, and has never received the remaining five bales. At the time deponent received this last bale, there was considerable cotton on the levee, of the cargo of the Planter, which had not been delivered.

Deponent says, that the custom which prevails in discharging and delivering cotton in New Orleans, is this: The party to take and haul away the cotton, ascertains from the boat's manifest on her arrival, the number of bales and their marks intended for his press. He commences to haul away the cotton when it is put upon the levee, as soon as practicable. From the numbers and different marks, it is impossible for the draymen to know positively whether he has all his cotton until toward the last.

His cotton very frequently gets mixed up with the piles for other presses: it is not, in consequence, the custom to give a receipt for the cotton, until the drayman is satisfied that he has all which he has to take away. It is on this receipt that the freight is collected. No house would pay the freight without this receipt, unless under certain circumstances, and with the guaranty of the boat.

*Hynes*, in his cross-examination, testifies. that he did not go to the Planter early on Monday morning, because he had to go to get cotton from the steamboat Eclipse, which had arrived before the Planter. He did not put extra drays to haul away the six bales from the Planter, because the cotton had not been longer on the levee than usual. He considers the usual time for cotton to remain on the levee, to be forty-eight hours, after it is assorted and the parties notified, and if he does not call for it, he considers it the duty of the boat to have it stored or given to the wharf-master.

*Hynes* further testifies, "I looked at the manifest of the boat, the day she arrived, and saw the cotton consigned to the defendants and took the marks, and asked the clerk if he could give me the cotton that day; he said he could not, as it was not sorted, and on the next day, I hauled away the twenty bales." He further testified, that it was too late on Saturday evening to get drays to haul away more than the twenty which he was enabled to haul away, because he had four drays to spare from the steamer Eclipse, for one load that afternoon.

Plaintiffs did not introduce any evidence to controvert the customs of the port New Orleans, as to the delivery of cotton. If it were possible so to have done, there would have been no difficulty in establishing the contrary.

We are, therefore, of opinion, that by the custom and usage of the port of New Orleans, the consignee was not guilty of any laches, and that the responsibility of the boat was not ended, when the cotton was demanded by the consignee.

Judgment affirmed, with costs.