(105 So. 82)

No. 26452.

## AMERICAN TRADING CO. OF NEW ORLEANS v. NEW ORLEANS & N. E. R. CO.

(June 22, 1925.)

*(Syllabus by Editorial Staff.)*

**1. Carriers ⬅180(1)—Initial interstate carrier liable for shipper's full loss, notwithstanding contractual limitations.**

Under Interstate Commerce Act and amendments, initial carrier is liable for shipper's full actual loss, or damage, notwithstanding limitations of liability or amount of recovery in receipt, bill of lading, contract, rule, regulation, or tariff.

**2. Carriers ⬅172—Carrier voluntarily accepting interstate shipment to point on another line treated as having made through contract and elected to treat connecting carriers as agents.**

Under Carmack Amendment, carrier voluntarily accepting goods for shipment to point on another line in another state is conclusively treated as having made through contract and elected to treat connecting carriers as its agents for all purposes of transportation and delivery.

**3. Carriers ⬅177(3)—Initial interstate carrier liable for every kind of positive misconduct and negligence of connecting carrier.**

Initial carrier of interstate shipment is liable for every kind of positive misconduct of connecting carrier affecting property, and for its negligence and lack of care or effort.

**4. Carriers ⬅117—Duty of carrier, accepting sugar for transportation, to furnish safe and suitable car protecting it from elements.**

It is duty of carrier, accepting sugar for transportation, to furnish safe and suitable car, which will protect it from elements.

**5. Carriers ⬅177(3), 178—Carrier held liable as insurer or warehouseman for damage to and loss of sugar.**

Initial carrier, furnishing car with leaky roof and bad doors for shipment of sugar, moving sugar about considerably during repairs en route, and leaving it scattered over half of car, *held* liable, either as carrier occupying position of insurer, or as warehouseman failing to use ordinary care and diligence to protect goods, for damage by rain after arrival at destination, before removal into warehouse, and loss of sugar spilled on floor of car.

**6. Carriers ⬅135—Not liable for loss caused by market conditions on sale of undamaged sugar.**

Carrier *held* not liable to shipper for loss, caused by market conditions, on undamaged sugar, sold with damaged sugar at uniform price per pound.

**7. Carriers ⬅135 — Shipper selling damaged and undamaged sugar together held entitled to difference between contract price and amount realized from sale of damaged sugar.**

Where exact value of damaged sugar, at time of sale with undamaged sugar at uniform

price per pound, cannot be ascertained, and shipper's failure to show greater loss was due to his own action in selling sugar as whole, damages will be allowed against carrier in amount of difference between contract price of sugar and amount actually realized from sale of damaged sugar; carrier not being entitled to complain because price obtained was greater than if such sugar had been sold separately.

**8. Carriers ☞135—Shipper held not entitled to recover freight and other transportation charges, nor expenses of selling damaged sugar.**

Shipper of sugar, damaged and lost by carrier, cannot recover freight and other transportation charges paid, nor expenses of selling damaged sugar, where latter are not definitely determinable.

Appeal from Civil District Court, Parish of Orleans; William H. Byrnes, Jr., Judge.

Action by the American Trading Company of New Orleans against the New Orleans & Northeastern Railroad Company. Judgment for plaintiff, and defendant appeals. Amended, and affirmed as amended.

Monroe & Lemann and Watts K. Leverich, all of New Orleans, for appellant.

Dart & Dart, and Louis C. Guidry, all of New Orleans, for appellee.

ROGERS, J. In July, 1920, the American Trading Company of New Orleans sold to the Merchants' Grocery Company, of Knoxville, Tenn., 500 bags of granulated sugar of the gross weight of 51,091 pounds, and a net weight of 50,591 pounds. The sugar was delivered at New Orleans, on July 26, 1920, to the New Orleans & Northeastern Railroad Company, and loaded in a car furnished by said company, for transportation to its destination. The shipment arrived at Knoxville on July 30, 1920, and was placed on the Oak street drayage track on July 31, 1920. On the same day notice of its arrival was presented to the consignee, which refused to accept it. This refusal was communicated to the shipper by wire on August 2, 1920.

On July 31, 1920, representatives of the purchaser and of the broker who had made the sale inspected the sugar; the car which, contained it having been opened at their request by a clerk of the delivering carrier, although it appears he acted without authority in so doing, when some of the bags were found to be wet, several bags were found torn open, many of the bags had holes in them, and some of the sugar was wasted on the floor of the car. On August 6, 1920, another inspection of the shipment was made by representatives of the consignor and consignee, when the damaged condition of the sugar was again noted. At neither of these inspections was any representative of the railroad company present.

On August 11, 1920, the carrier was requested, for the first time, to inspect the sugar. This request was complied with, and the examination was made on August 12, 1920, when the sugar was unloaded into the warehouse. As noted on the freight bill, this inspection showed that 495 bags were received (thus checking 5 bags short), of which 305 were good dry bags; 124 bags were wet; 63 bags were wet and torn, out of which 260 pounds were missing; and 51 pounds of dirty sugar were picked up off the floor of the car.

It appears that the sugar was permitted to remain in the freight car from July 31, 1920, until August 12, 1920, when it was removed to the warehouse, pending the controversy which arose between the consignor and consignee. The entire carload was finally sold as damaged goods for a uniform price of 12 cents per pound. The consignor then brought suit at Knoxville against the consignee to recover the purchase price of the sugar. This suit was compromised between the parties, and the consignee assigned to the consignor its claim against the defendant railroad company and its connecting carriers. The record fails to disclose the amount paid in compro-

mise by the grocery company to the trading company.

Subsequently, the consignor, the American Trading Company of New Orleans, in its own name and as the assignee of the consignee, the Merchants' Grocery Company, brought this suit against the defendant railroad company in the civil district court for the parish of Orleans.

Plaintiff, in its petition, alleged: That it had originally sold the sugar at 22 cents per pound f. o. b. New Orleans, La., sight draft, bill of lading attached; the total invoice value being $11,130.02. That the sugar was sold in its damaged condition at 12 cents per pound on an ascertained weight of 49,291 pounds, netting $5,914.92. Plaintiff claimed the difference between these amounts, $5,215.10, plus $677.96, which it had paid for freight and other transportation charges, or a total amount sued for of $5,983.06. The court below refused to allow the claim for freight charges, but gave plaintiff judgment for the balance of its claim, $5,215.10, plus $100 for selling charges, or for $5,315.10; and from this judgment the defendant company has appealed.

[1] The only question in dispute is the measure of plaintiff's damages. It is admitted that the shipment was an interstate commerce movement and that the rules governing interstate commerce are applicable. Under the Interstate Commerce Act and its amendments, the initial carrier is liable for the full actual loss, damage, or injury suffered by the shipper, notwithstanding any limitations of liability or limitation of the amount of recovery in any receipt, bill of lading, contract, rule, regulation, or tariff.

Plaintiff contends that the measure of its damages is the difference between the invoice value of the sugar plus selling expenses, less the amount realized from the sale.

Defendant contends, on the other hand, that the measure of plaintiff's damages is the difference in the market value of that portion of the shipment in its damaged condition, at destination, at the time of tender of delivery, and its market value at the same time and place if tendered in good condition. Defendant also makes the further contention that it is liable only for the loss or damage to the goods while in transit, because, under the terms of the bill of lading, after 48 hours from the time of notice of the arrival of the shipment was given to the consignee, the delivering carrier held the goods as a warehouseman and not as a carrier. The legal principle involved in this contention has been upheld by the United States Supreme Court. Southern R. Co. v. Prescott, 240 U. S. 632, 36 S. Ct. 469, 60 L. Ed. 836.

[2, 3] Wherever a carrier voluntarily accepts goods for shipment to a point on another line in another state, it is conclusively treated, under the Carmack Amendment to the Interstate Commerce Act, as having made a through contract, and as having elected to treat the connecting carriers as its agents, for all purposes of transportation and delivery. In such a case the rights of the shipper and of the carrier are the same as though the point of destination, though on another line in another state, was on the line of the initial carrier. The liability of the initial carrier is for every kind of positive misconduct of the connecting carrier affecting the property, and for its negligence and lack of care or effort.

[4, 5] For the purposes of this case, it is immaterial whether the liability of the defendant railroad company is wholly that of a carrier or wholly that of a warehouseman, or whether its liability arises partly from one and partly from the other of these circumstances.

It was the duty of the said company to have furnished a safe and suitable car for the transportation of the sugar—a car which would protect it from the elements. It is

shown by the evidence, however, that the car which was furnished by the defendant was defective; that it was an old car, with a leaky roof and bad doors, "easily accessible to the blowing rains." At some point while en route the car had been opened for the purpose of repairing the king bolt; i. e., the bolt that holds the car to the trucks. During the progress of these repairs, the sacks of sugar were moved about considerably, and they were left by the repairers scattered over fully one-half of the car. It was during this time, undoubtedly, that the bags were torn and the sugar spilled out on the floor. It was also established that during the period from July 30, 1920, the date of the arrival of the car at its destination, until August 12, 1920, the date of the removal of the sugar into the warehouse, the rainfall at Knoxville was abnormal; a total of 7.33 inches having fallen between said dates.

It is undoubtedly true that the damage to the sugar was not as great on July 31, 1920, the date when the liability of the defendant as a carrier may have ceased and its liability as a warehouseman may have begun, as it was on August 12, 1920, when the sugar was removed from the car and placed in the warehouse proper. But the primary cause of this increased damage was the defective condition of the car in which the sugar was stored. If the car had been sound, and its roof had been free from leaks, no matter to what extent the rain may have fallen, the water would not have penetrated the car and damaged the sugar.

In these circumstances, it cannot be said that the defendant railroad company exercised the reasonable care and diligence required of warehousemen. It is, therefore, liable in any event, as a carrier occupying the position of an insurer, or as a warehouseman failing to use ordinary care and diligence to protect the goods from loss and damage.

[6-8] Passing to the consideration of the measure of damages, we find that plaintiff chose to treat the whole shipment as constituting a damaged shipment. Accordingly, and in the belief that it was good business judgment so to do, it sold the entire carload for $5,914.42. This, as we have heretofore stated, was at a uniform price of 12 cents per pound on an ascertained weight of 49,291 pounds. It was clearly established, however, that 305 bags were good and dry, and that the sugar which they contained was uninjured. We do not think these 305 bags of good sugar should have been sold as damaged sugar. It may have been good business judgment to dispose of the goods in the manner adopted by the plaintiff; but, if this was so, it was due primarily to the state of the sugar market at the time, and not to the damaged condition of the goods. The evidence shows that the sugar market began to break on July 30, 1920, the day the shipment arrived; that the market was panicky; that "everybody was trying to get from under their holdings," and large quantities of resale sugar were offered; that the few scattered buyers were purchasing only for their wants at the very lowest prices they could obtain. The price of American standard granulated, from August 1st to the middle of the month, ranged from about 19 cents down to 16½ cents per pound, and Salvador sugar, which was the character of the sugar in plaintiff's shipment, was worth a half a cent a pound less. We do not think the railroad company can be compelled to make good plaintiff's loss on the sugar, which was caused by market conditions and not by any injury which it suffered while in the company's custody. On the other hand, the price of the sugar actually damaged was undoubtedly enhanced because of the fact that it was sold confusedly with the good sugar. If it had been disposed of separately, it is obvious that it would not have brought so good a price as 12 cents per pound. If we were assured that the exact value of

the damaged sugar at the time of its sale could be ascertained, we would remand the case for that purpose; but, inasmuch as, from the state of the present record, it seems clear that no good purpose could be served by such remand, that defendant cannot be heard to complain because of the fact that the price obtained for the damaged sugar as it was sold was greater than would have been obtained if it had been sold separately, and the failure of the plaintiff to show a greater loss is due to its own action in selling the carload of sugar as a whole, and not merely confining its efforts to the disposition of the damaged portion of the shipment, we have concluded to ascertain and allow the damages on the basis of the amount actually realized from the sale of damaged sugar at 12 cents per pound. Plaintiff's actual loss is the difference between the price at which it sold the sugar and the amount which it realized from the sale of the damaged sugar. It is not entitled to recover for the freight and other transportation charges which it paid; nor are we in a position to definitely determine the selling expenses of the damaged sugar.

We find plaintiff's loss to be as shown on the following statement, viz.:

5 bags short, at 101.182 lbs. per bag, or 505.91 lbs., at full invoice price of 22 cents per pound ........................................ $ 111 30
260 pounds missing out of 63 torn bags, at full invoice price of 22 cents per lb........ 57 20
63 bags wet and torn, at 101.182 lbs., or 6,374.466 lbs., less 260 lbs. missing as above, or say 6,114.466 lbs. sold at a loss of 10 cents per pound............................ 611 44
124 bags wet at 101.182 lbs. per bag, or 12,-546.68 lbs. at a loss of 10 cents per pound 1,254 66

Total loss or damage...................... $2,034 60

We have not included in the above statement the 51 pounds of dirty sugar found on the floor, since, obviously, it is included in the allowance for 260 pounds of sugar missing from the 63 wet and torn bags.

For the reasons assigned, it is ordered that the judgment appealed from be, and it is hereby, amended by reducing the amount of said judgment in favor of plaintiff and against defendant from $5,315.10 to $2,034.60, and that, as thus amended, the said judgment be affirmed; plaintiff and appellee to pay the costs of appeal.

O'NIELL, C. J., absent.
ST. PAUL, J., concurs in decree.