### No. 654

### First Circuit

---

### POHLMAN v. YAZOO & MISS. VALLEY R. R. CO.

(October 8, 1930. Opinion and Decree.)

---

E. S. Muse, of St. Francisville, attorney for plaintiff, appellee.

James H. Kilbourne, of St. Francisville, attorney for defendant, appellant.

ELLIOTT, J. Charles B. Pohlman, as consignor, shipped a carload of sweet potatoes to A. H. Hopkins & Co., as consignee, at Minneapolis, in the state of Minnesota. The consignment was received by the Mississippi Valley Railroad Company at St. Francisville, La. The initial carrier issued a through bill of lading by means of which it passed into the hands of the Minneapolis & St. Louis Railroad Company, and was by it conveyed to its destination.

The bill of lading provides for "Standard ventilation to heater district'" and "Carrier's Protective Service in heater district." And states that the potatoes were apparently in good condition when received. The shipment reached Minneapolis on December 25, 1925, but its arrival was not notified to the consignee until December 26, 1925, and at what hour the evidence does not show. The consignee opened the car and examined the potatoes on December 30th, but did not receive them until the next day, December 31, 1925. The car was unloaded immediately after delivery on the 31st. The potatoes had been found to be in bad condition when the car was opened on the 30th. The potatoes were sorted and sold in small packages to the best advantage, bringing a total of $536.65. But if the potatoes had been in as good condition on December 31, 1925, as they were when loaded at St. Francisville on December 19th, they would have brought a total of $828.

Expenses and freight deducted left $160.79, which was remitted to the plaintiff, causing a loss to him of $271.71, which is claimed of the defendant in the petition.

The plaintiff alleges that the damage to the potatoes was caused by being exposed to excessive cold weather, due entirely to the gross fault, carelessness and negligence of the defendant in transit.

Plaintiff's averments of fault, carelessness and negligence are denied by the defendant. The defendant further alleges that the shipment left St. Francisville on the 19th of December, 1925, was moved with reasonable dispatch and arrived at its destination without damage on December 25, 1925. That the consignee was notified of its arrival on the morning of December 26, 1925, but the potatoes were not unloaded until December 31, 1925, when the consignee signed for them without exception. That any loss or damage which they sustained was due either to the failure of the consignee to promptly call for the delivery of said potatoes when notified and the delay in unloading, or the inherent nature of the potatoes and the way they were handled and loaded by the shipper

and their condition when shipped, or both, and not to any negligence or failure of defendant in its duty and obligation as common carrier.

That said car of potatoes was given proper handling, moved without delay, given the protection called for in the bill of lading, and defendant is not liable for any loss or damage to plaintiff, as alleged in his petition.

There was judgment in the lower court in favor of the plaintiff as prayed for and the defendant has appealed.

The defendant objected to various offerings in evidence. The offerings objected to are not such as can influence the decision in any important matter. The evidence accepted or rejected did no harm, even had there been error in the ruling, as to which we express no opinion. Then again, the objections, although noted, were not ruled on by the court, and as there was no ruling in the lower court, there is none that we can review. We therefore do not act on any of the objections urged by the plaintiff in his brief.

The plaintiff Pohlman, J. A. Ard, Andrew Collins and W. R. Daniel, testify that the potatoes when loaded were dry and in good condition and of good quality.

D. D. Harris, clerk for defendant at St. Francisville, testified that the potatoes were wet when loaded, but the preponderance of the testimony on the subject supports the claim of the plaintiff that such was not the case. We find that the potatoes were of good quality, dry and in good condition when loaded in the car at St. Francisville.

The parties agree that the stipulation in the bill of lading, "Standard ventilation to heater district" means "that on sweet potatoes all ventilating devices will be closed after the outside temperature falls to 40 degrees above zero, and that all ventilating devices will be opened after the outside temperature runs 40 degrees above zero."

That the clause "Carriers Protective Service in heater district" means when it is against cold, that the "carrier will protect the shipment within heater territory against frost, freezing or artificial overheating, furnishing if necessary artificial heat, or such other protective service as may be necessary to obtain that result."

The evidence shows that the district which generally requires protection from cold, as to shipments going north, commences at St. Louis. The car arrived at Minneapolis on December 25, 1925, at 5:25 a. m. William Revack, witness for defendant, clerk and employee of Minneapolis & St. Louis Railroad Company, says in one place that the car was set out and delivered to consignee at 8:30 a. m. on December 25, 1925, but that is clearly a mistake on the part of the witness. The Minneapolis & St. Louis Railroad Company did not notify A. H. Hopkins & Company of its arrival until next day, December 26, 1925. The evidence shows that the car remained on the team track, which was the track on which it was placed when it first arrived, until December 26th, when the Minneapolis & St. Louis Railroad Company took it off the team track and placed it in a building called the paint shop, but which was evidently its warehouse, in order to protect it against the cold. That two heaters burning in the car when it arrived were turned out by Revack. It appears that the car received no protection from the intense cold until next day, when it was placed in the paint shop, where it remained until December 31,

1925, at which time the weather had moderated sufficiently for it to be taken out and delivered to A. H. Hopkins & Company. It was by them immediately unloaded, the potatoes sorted and those not injured were sold out in small quantities.

Messrs. Hopkins and Johnson were asked to explain why the car was not opened and inspected when they received notice of its arrival and they say that it was too cold to open the door on December 26, 1925; that the car could not be opened with safety until the 30th, and on account of the extremely cold weather, could not be unloaded until December 31st.

Messrs. Hopkins and Johnson declare that the damage to the potatoes could not have occurred between the time of arrival and the time of delivery if the car had been properly handled by the carriers, and the potatoes had been in sound condition at the time of arrival. That when they first examined the car in the paint shop on December 30, 1925, the doors of the car were open. That the car had been frozen around the sides, ends, bottom and top. That there was a lot of mold on most of the sacks, no doubt due to too much heat, after the freezing injury. That the frost was drawing out of the potatoes and they were slimy, wet, full of mold and beginning to decay.

Speaking of the temperature at Minneapolis, they say that on December 25, 1925, which was the day previous to the receipt of notice by them of the arrival of the shipment, the temperature went from 11 above to 4 degrees below zero. On the 26th, from 3 below to 13 below. On the 27th it went from 7 above to 11 below. On the 28th from 7 above to 5 below. On the 29th from 15 above to 4 below. On the 30th from 16 above to 5 above, and on the 31st from 33 above to 8 above.

The car, therefore, required protection from cold when it arrived. As the car containing the potatoes was out on the team track of the Minneapolis & St. Louis Railroad Company during the night of the 25th and part of the 26th without heat, we readily agree, that if it was not frozen before it reached Minneapolis, it was frozen on the night of the 25th, and remained frozen the next day, until it was taken off the team track and placed in the paint shop.

Sweet potatoes cannot stand a temperature below zero, and to permit them to freeze, is to permit them to perish, as far as their value as human food is concerned. The condition in which they were found on the 30th was the inherent result of freezing, followed by warmth.

The defendant argues that the potatoes arrived at their destination in good condition and were delivered to and injured while in the possession of the consignee.

We find that the acceptance of delivery of a vegetable product so susceptible to freezing as sweet potatoes cannot be forced on a consignee under such weather conditions as prevailed in the city of Minneapolis on December 26th. If the consignee is unwilling to receive the consignment it is the duty of the carrier in such a situation to protect it from temperature below zero, until a delivery can be made without the product being destroyed and rendered worthless as a result of delivery.

In Gibbons v. Y. & M. V. R. R. Co., 130 La. 671, 58 So. 505, and Wood v. La. & Ark. R. R., 158 La. 504, 104 So. 306, the court in effect held:

"Liability of a railroad as a carrier in this State continues until consignee has been notified and given a reasonable time thereafter to remove goods transported

in the absence of any valid stipulation in bill of lading, or agreement between parties to the contrary."

See also Sleade v. Payne, 14 La. Ann. 453:

"In this state the rule is that the consignee must take possession of his goods within a reasonable time after notification by the carrier on their arrival, and where he fails to do so, the carrier, after the lapse of a reasonable time becomes liable only as a warehouseman."

Same authorities.

The subject of what constitutes a reasonable time in which to accept goods after notice, is considered in Ruling Case Law, vol. 4, subject: Carrier, secs. 223 and 224, pp. 756 to 758.

The Interstate Commerce Act, sec. 20, par. II, as amended, known as the Carmack amendment (49 U. S. C. A., sec. 20, par. 11), provides with reference to a through bill of lading for an interstate shipment, that:

"Any common carrier, railroad or transportation company subject to the provisions of this chapter, receiving property for transportation from a point in one state * *, to a point in another state * *, shall issue a receipt or bill of lading therefor and shall be liable to the lawful holder thereof for any loss, damage or injury to such property caused by it, or by any common carrier, railroad or transportation company to which such property may be delivered, or over whose line or lines such property may pass, within the United States * *, when transported on a through bill of lading, and no contract, receipt, rule, regulation or other limitation of any character whatsoever shall exempt such common carrier, railroad or transportation company from the liability hereby imposed. And any such common carrier, railroad or transportation company so receiving property for transportation from a point

in one state * *, to a point in another state * *, shall be liable to the lawful holder of said receipt or bill of lading or to any party entitled to recover thereon, whether such receipt or bill of lading has been issued or not, for the full actual loss, damage or injury to such property caused by it, or by any such common carrier, railroad or transportation company, to which such property may be delivered, or over whose line or lines such property may pass * * when transported on a through bill of lading, notwithstanding any limitation of liability or limitation of the amount of recovery, or representation or agreement as to value in any such receipt or bill of lading, or in any contract, rule, regulation ,or in any tariff filed with the Interstate Commerce Commission and any such limitation, without respect to the manner or form in which· it is sought to be made, is declared to be unlawful and void."

The Supreme Court of the United States has held in many cases that this Act is, as to interstate shipments on a through bill of lading as in the present case, the supreme law of the land and has also considered, the effect of notice of arrival and as to what constitutes necessary delays.

Atlantic Coast Line v. Riverside Mills, 219 U. S. 186, 31 S. Ct. 164, 55 L. Ed. 167, 31 L. R. A. (N. S.) 7; Norfolk & Western R. Co. v. Dixie Tobacco Co., 228 U. S. 593, 33 S. Ct. 609, 57 L. Ed. 980; Michigan Central R. R. Co. v. Mark Owen & Co., 256 U. S. 427, 41 S. Ct. 554, 65 L. Ed. 1032. See, also, American Trading Co. of N. O. v. N. O. & N. E. R. R. Co., 159 La. 9, 105 So. 82, and Ruling Case Law, vol. 4, subject, "Carriers," as to necessary delays for delivery.

Defendant contends that these potatoes perished as a result of the inherent quality of sweet potatoes and their tendency to decay when disturbed. In this connection

the testimony of Mr. Harvey, a farmer of more than 40 years' experience, has been considered. He states that sweet potatoes are very perishable, and that it has been his experience that, after they have been stored for a while and then moved, they begin to decay, four or five days after they have been moved, but such does not happen every time. We understand from Mr. Harvey that sweet potatoes, after having been banked and then taken up and moved as in shipment, often decay within four or five days thereafter, some of them. We are satisfied that Mr. Harvey did not mean that there would set in such a general wholesale decay, all at one and the same time, of potatoes that were dry and of good quality, as took place in this instance.

Under ordinary conditions it would have been necessary to throw out a few after their arrival in Minneapolis, but not enough to impair the value or integrity of the shipment in such a short time. We are satisfied that the condition in which this shipment was found to be on December 30, 1925, was due to freezing followed by overheating, as stated by Messrs. Hopkins and Johnson.

Mr. J. C. Weber, witness for defendant and inspector for the Moorhead Inspection Bureau at Minneapolis, testified that he had personally inspected these potatoes on December 25, 1925, at 10:30 a. m., which was soon after the car had reached Minneapolis. He declared that he saw no signs of the injury having been due to freezing followed by overheating, but gave it as his opinion that the condition the potatoes were in, at the time he examined them on the 25th, was due to their quality. Some, he says, were wet and moldy; some had been cut in digging; some showed growth cracks; some were worm-eaten; and some showed other faults; that from 75 to 90 per cent had loose feathery skins, due, he thought, to immaturity. This witness examined the potatoes again on the 30th and found them in pretty much the same condition they were when he first looked at them on the 25th. This witness was asked, if sweet potatoes shipped from St. Francisville on December 19, 1925, should have been delivered to the consignee in Minneapolis in good condition on December 31st, if given the proper care provided for under the standard ventilation and heating district agreement contained in the bill of lading, and he declared that he could not answer directly, that too many elements entered into the matter; for instance, the climatic condition, field condition, diseased soil, etc.; that sweet potatoes were often apparently sound when shipped, but were in reality infected at the time with disease, not noticeable at the time of harvesting.

We do not agree with the defendant, that the condition in which these potatoes were found to be on December 30, 1925, was due to inherent quality, as explained by Mr. Harvey, nor to the particular conditions stated by Mr. Weber, but we find that their condition was due to freezing followed by overheating while in the hands of a connecting carrier.

Under the stipulations of the bill of lading, it was the duty of each of the carriers into whose hands the car passed to give the shipment proper protection from cold as well as from excessive heat until delivery, and it is our conclusion that it was not done.

A. H. Hopkins & Co., by accepting the potatoes in the condition they were in on

December 31, 1925, did not, under the Carmack Amendment to the Interstate Commerce Act, relieve the initial carrier of the loss and damage occasioned to the shipment resulting from the connecting carrier's fault and neglect to give the shipment proper protection from freezing and overheating until delivery. The shipment could not be delivered under the existing and prevailing weather conditions against the wish and without the consent of the consignee, at the time notice of the arrival of the potatoes was received on December 26th. A delivery at that time, would have been, from a carriage and practical standpoint, as if no delivery was made, because a delivery with the weather below zero would have meant frozen potatoes, then, if they had not been previously frozen with resulting loss of the shipment.

The evidence does not enable us to determine whether the potatoes were frozen before or after the car arrived at Minneapolis, but it does satisfactorily appear that it occurred after the car left St. Louis, and while in the hands and possession of Minneapolis & St. Louis Railroad Company, a connecting carrier, and before the arrival of the car in Minneapolis had been notified to the consignee, and before delivery to the consignee, which fact, under the law governing the shipment, placed responsibility for the loss and damage, insofar as concerns the shipper, on the initial carrier, and justified this suit against it.

The evidence shows that plaintiff has sustained the loss claimed in his petition.

The judgment appealed from is correct.

Judgment affirmed; defendant and appellant to pay the costs in both courts.