**WESTERN MILLERS MUT. FIRE INS. CO. v. THOMPSON et al.**

No. 5345.

United States District Court
W. D. Missouri, W. D.

Feb. 6, 1951.

994·

John W. Hudson, Harold J. Toner, Kansas City, Mo., for plaintiff.

Beeson & Dabbs, Kansas City, Mo., for Guy A. Thompson.

Horace F. Blackwell, Jr., of Lathrop, Crane, Sawyer, Woodson & Righter, Kansas City, Mo., for Illinois Cent. R. R.

Sam M. Wear, U. S. Atty., David A. Thompson, Asst. U. S. Atty., Kansas City, Mo., for Commodity Credit Corporation.

REEVES, Chief Judge.

Jurisdiction of this cause in this court exists by reason of the provisions of Section 714, Title 15 U.S.C.A. relating to the general subject of the defendant Commodity Credit Corporation and its liability to be sued in the district courts of the United States or in the District of Columbia.

The plaintiff is a resident of Missouri and is engaged in the business of insurance and particularly in the issuance of policies to cover the loss of a manufactured product known as flour, while in transit by common carriers. In its capacity as an insurer it granted a policy of insurance to American Flours, Inc., of Newton, Kansas, and also a policy to the Teichgraeber Milling Company of Gypsum, Kansas. In like manner other insurers, engaged as was plaintiff, granted or issued policies to the above named milling companies at approximately the same time. The policies contained practically the same provisions or coverage.

American Flours, Inc., on or about September 8, 1947, as per the terms of an earlier contract, sold to the defendant Commodity Credit Corporation, f. o. b. destination Gulfport, Mississippi, 10 carloads of flour. This flour was inspected and accepted at point of origin by said corporate defendant, the vendee, and thereafter moved over the Missouri Pacific Railroad pursuant to bills of lading duly issued. Freight tariffs were paid by the said American Flours, Inc.

The route of said shipments involved the delivery by the Missouri Pacific Railroad Company to the defendant Illinois Central Railroad as the final and last carrier at Memphis, Tennessee.

On the 10th of September, 1947, the Teichgraeber Milling Company of Gypsum, Kansas, as per prior contract, in like manner sold 4 carloads of flour to the said defendant Commodity Credit Corporation, which also was inspected and accepted at Gypsum, Kansas, and, as in the case of American Flours, Inc., said shipment was billed over the Missouri Pacific and delivered to the defendant, Illinois Central

995

Railroad, and thence hauled to Gulfport, Mississippi, as per straight bill of lading issued by said Missouri Pacific Railroad Company.

All the cars of both shipments reached Gulfport, Mississippi, or its environs, and all were delivered to the said defendant, Commodity Credit Corporation. In transit, however, and before delivery, damages were sustained to the flour in several of the cars, and particularly heavy damages accrued to the flour in 3 cars left or spotted on the west pier of the dock at the destination, namely, Gulfport, Mississippi. All of the flour was designed for export by the defendant, Commodity Credit Corporation, and had been hauled to Gulfport by rail for the purpose of export by steamships.

The sales contract between the vendors and the vendee contained the following express provisions:

"*Sales F. O. B. Cars or Trucks at Port, F. A. S. Port or Delivered Port:* In the event an offer is made by the vendor, and accepted by CCC, for a sale f. o. b. cars or trucks at port, f. a. s. port or delivered port, payment of the purchase price shall be made upon receipt of the bill of lading, inspection certificate, and accompanying documents; *and the vendor shall indemnify CCC for any loss or damage occurring after the flour is loaded on board car or truck and before it is unloaded and accepted by CCC at port.*" (Emphasis mine.)

Upon inspection at Gulfport, the destination of the shipments, the damage to the flour was discerned or ascertained and vendee Commodity Credit Corporation promptly made demands for indemnification, which means a refund in the amount of the loss or damage sustained in transit. A refund was made by the vendors in each instance and the vendee was indemnified as provided in the contract. The plaintiff and its co-insurers reimbursed the vendors or shippers for the payments or refunds thus made to the vendee and claimed subrogation to all the rights of the vendors. The several other insurers assigned their right or interest in any recovery to the plaintiff who brought this suit as assignee of its co-insurers and as subrogee of the two ven-

dors or shippers, namely, American Flours, Inc., and Teichgraeber Milling Company. It bases its right of recovery upon the several grounds that the defendant, Commodity Credit Corporation, had improperly and wrongfully required the vendors to make refund to cover damages, and, secondly, that the defendant Illinois Central Railroad Company was negligent in handling the several shipments, and that by reason of such negligence the flour was damaged.

It is practically conceded that the product shipped, as above stated, was damaged as seriously as contended by the defendant, Commodity Credit Corporation, the purchaser. The damage thus suffered was occasioned by a hurricane, crossing the Atlantic from Africa, and spending its force in the Gulf of Mexico and contiguous shores, including Gulfport, Mississippi.

It is the contention of the plaintiff, as assignee of its co-insurer and subrogee of the shippers, that fair warnings of the hurricane to all interests at Gulfport were publicly given and imparted to the operatives of the defendants' railroads in time for the exercise of such precaution and care as would have saved the product from the damages sustained.

From the evidence it appeared that 3 of the 14 cars had been placed on the pier, known as the East pier, at Gulfport, several days before the hurricane, and that, on the day preceding the extreme violence of the hurricane, these cars, by order of the Port authority, or Port Director, were transferred to the West pier, where they were when the Storm broke in its greatest fury or force on the morning of September 19, 1947. Three other cars were at a station called Hattiesburg, several miles north of Gulfport, but were hauled, after the storm had somewhat abated, to Gulfport, and, because of strong winds and rain incident to the hurricane, water was driven into these cars in such way as to damage the flour. The other 8 cars were in a place known as the Lyman-Wortham area, several miles north of Gulfport, but, by reason of the strong wind and a driving rain, the flour in these cars also was damaged. As indicated, the greater damage

996

was to the 3 cars on the West pier of the Gulfport shipping port.

It was in evidence that hurricane signals had been displayed at Gulfport preceding the maximum fury of the storm which occurred between the hours of 7 and 9 A.M. on September 19th, 1947. Shippers and others, however, were distinctly advised that the storm was a considerable distance at sea and that its direction was such as to justify the conclusion that it would strike the coast at a point beyond the mouth of the Mississippi River, several miles south of Gulfport, and that Gulfport would suffer no more than the usual disturbance occurring along the fringes of a hurricane. Moreover, it was in evidence that the approach of a hurricane to any specific point involved preliminary symptoms or conditions which would serve as a warning to the residents and business interests to prepare for the arrival of the storm in its greatest fury.

On the evening before the arrival of the storm, information was disseminated that it had proceeded several miles to the south, and that Gulfport would escape its main fury. Because of such information, the dock superintendent or Port Director, directed that the 3 cars in question be moved from the East pier to the West pier for unloading and export. The defendant railroad company, through its operatives, had no authority to remove said cars to the West pier without instructions from the Port authority, that is, the Port Director. Counsel for the defendant railroad aptly state the facts as follows: "The west pier and the warehouses and the facilities thereon were owned by the City of Gulfport and administered by a three man Port Commission and a Port Director as an unloading and shipping point for the export of Marshall Plan commodities. The east pier was owned by the railroad and was used for the temporary storage of cars containing these export commodities until needed for unloading on the west pier. The two yards in Gulfport were used to make and break up trains and for storage." The warehouse, however, on the east pier was owned by the City of Gulfport.

The shipping point, or dock, consisted of two piers, known as the East and West piers. The defendant railroad had some independent rights so far as the east pier was concerned. On the east pier, the warehouse, however, was owned by the city, as above stated, but the West pier was entirely under the control and direction of the Port authorities or Port Director. The shipping facilities were in their nature a utility, controlled by the City through its Port authorities.

As indicated, the hurricane broke with rather extreme fury on Gulfport at the time suggested. It exceeded anything previously experienced and struck without the usual preliminary warnings. It was a devastating hurricane. Property was promiscuously damaged and destroyed. Boats in the harbor or port were thrust upon the shores. The railroad tracks on the east pier were destroyed, and loaded cars were overturned and seriously damaged on the west pier. The waters of the gulf were swept beyond the seawall, and much damage was suffered by property owners at points usually considered safe from the fury of the sea.

Other facts as they may become pertinent will be detailed and discussed in the course of this memorandum opinion.

1. It is difficult to see from the evidence and an examination of the extensive record in this case wherein the Commodity Credit Corporation is in any way liable. It purchased the flour from the two manufacturers, and, after inspection, directed the shipment over the two lines, namely, the Missouri Pacific and the defendant Illinois Central, as a connecting carrier. It had an express contract with these two shippers that the product purchased would be delivered in good condition f. o. b. Gulfport, and that "for any loss or damage occurring after the flour is loaded on board car or truck and before it is unloaded and accepted by CCC at port" the vendor "shall indemnify CCC."

There was no issue of fact as to the damage accruing to the shipments, and no question but that the shippers by express contract agreed to indemnify the purchas-

er, CCC, "for any loss or damage occurring" in transit.

■■ When demand was made for such indemnity the shippers promptly responded, although it is alleged that they did so because of the threat of the vendee to deduct such indemnity from the consideration to be paid for other purchases. Clearly the shippers could not complain that they were compelled to respond to a clear and an unambiguous obligation upon them fixed by their own solemn contracts. It would seem, therefore, that Commodity Credit Corporation ought not to have been made a party, and, since plaintiff is a corporation of Missouri, it did not have the right to invoke the jurisdiction of this court. Moreover, the controversies are separable.

2. However, assuming and exercising the jurisdiction prima facie conferred upon the court, there should be a further inquiry to determine the liability, if any, upon the defendant, Illinois Central Railroad. The first count of the complaint relates to the damages sustained by the 10 cars shipped by American Flours, Inc., Newton, Kansas. The complaint in that count is that the damaged flour rejected by Commodity Credit Corporation was sold for salvage and that the shipper was not notified of the fact and given an opportunity to supervise said sale and to procure a better price. An inspection of the bills of lading shows the following: that such shipments were consigned to the consignee "USDA, P&MA % Gulfport Port Commission, Gulfport, Mississippi, notify Paul K. DeBruhl, USDA, P&MA U. S. Customhouse & Courthouse, Mobile, Ala."

■ The evidence showed that officers of the Gulfport Port Commission, that is the Port Director, gave orders in respect of the disposition of the cars sent in their or his care, and that Paul K. DeBruhl was not only notified, but that he came to Gulfport on September 21, 1947, and conferred with the officials, including representatives of the defendant railroad, as to what disposition should be made of the damaged flour. Such flour was sold as a result of these conferences, and according to all the testimony it brought an adequate return in view of its condition. The identical situation exists insofar as the second count is concerned. Clearly the plaintiff then would not be entitled to recover on either of these two counts.

3. The third count of the second amended complaint seeks damages against the remaining defendant carrier because of its alleged negligence in failing to remove the cars containing such product from the path of the storm. It should be stated here that the Missouri Pacific Railroad Company, the initial carrier, was at one time named as a party defendant, but a voluntary dismissal as to it was filed by the plaintiff, and by order of the court it was dismissed as a party.

■ It is claimed that the cars used for the transportation and the carriage of the product in question were not weatherproofed, were leaky and in a state of ill-repair for the use for which they were employed. On this question there was no proof other than the fact that a strong wind and a heavy driving rain coinciding had caused some of the bags of flour to become watersoaked and damaged. The burden was upon the plaintiff to prove these averments, but there was no such proof.

As heretofore indicated, 8 of the cars were in the Lyman-Wortham area, several miles north of Gulfport on sidetracks. The flour in these cars was damaged by reason of the strong wind and driving rain. It was part of the damage caused by the hurricane and it did not appear that freight cars as ordinarily and usually constructed would be invulnerable as against such a condition as existed at Gulfport and its environs at the time. It was a part of the disaster of the storm.

■ Damage caused by an unprecedented storm is ordinarily called an Act of God (Actus Dei) and excuses and vindicates the carriers, unless it appears that negligence of the carriers coincided with the storm, and then, in such cases, the carriers would be liable. There was no evidence that the cars thus furnished were in ill-repair and leaky, and not weatherproofed within the reasonable demands of ordinary and usual hauls made by them.

998

Under such circumstances, the court could not say that the defendant's negligence contributed to the damage caused by the fury of the hurricane. The same thing is true in respect of the asserted lack of precautions because of the claimed approach of the storm and its terrible velocity. With negligible exceptions the residents and businessmen of Gulfport were reassured by the reports regarding the course of the hurricane and only such precautions were observed as appeared to be demanded by such reports. The Port authorities who had the power to dominate, control and direct the activities of the railroad carrier at the docks were reassured regarding the approach of the storm until it actually struck at 7:30 on the morning of September 19, 1947.

■ The conduct of the carrier defendant can only be measured by the standard as to what a reasonably prudent and careful person would have done under the circumstances. It did precisely what others did at the same time and what others had previously done under similar circumstances. It could not reasonably have anticipated that the storm would have hit with such velocity and fury without preliminary warnings on the morning of September 19, 1947. Moreover, it does not appear that the cars enroute to Gulfport after the fury of the storm had abated would be the victims of a forceful wind and driving rain so as to sustain the damages which actually accrued. Furthermore, as to the 8 cars on the siding in the Lyman-Wortham area, there is an unsolved problem as to where they would have been safe from the force of the wind and rain.

Since the consignments were in the care of the Port authorities, it may be properly suggested that the entire responsibility for the safekeeping of this flour was upon the Port Director, and not upon the defendant carrier.

■ The case relied upon by plaintiff as a landmark case known as the Chesapeake & O. Ry. Co. v. J. Wix & Sons, 4 Cir., 87 F.2d 257, is inapplicable to the facts here for the reason that the storm in that case was not only one of great intensity, as in this case, but was directly approaching the exact point where the tobacco was stored in cars for which the defendant was responsible. The carrier knew this, and, 87 F.2d loc. cit. 259, the court applied the following sound principle:

" 'It requires no citation of authority to sustain the proposition that, after a carrier has discovered, or by the exercise of reasonable prudence and diligence should have discovered, that goods in his possession are subject to the perils of an unprecedented flood, or other vis major, it is his duty to exercise reasonable care and diligence to save them from damage or loss.' "

The salvage obtained by the carrier defendant has been tendered into court. The plaintiff is entitled to judgment for the amount thus tendered, and no more.

■ In view of all the facts and circumstances, the judgment of the court should be and will be for the defendants, with costs against the plaintiff.

The defendants will prepare and submit a proper journal entry.