# MICHIGAN CENTRAL RAILROAD COMPANY *v.* MARK OWEN & COMPANY.

CERTIORARI TO THE SUPREME COURT OF THE STATE OF ILLINOIS.

No. 299.   Argued April 28, 1921.—Decided June 1, 1921.

1. Under a "uniform" interstate bill of lading providing that property not removed, by the party entitled to receive it, within 48 hours after the notice of its arrival, may be kept in car, depot or place of delivery of the carrier, subject to a reasonable charge for storage and to the carrier's responsibility as warehouseman only, or may, at the carrier's option, be stored in a public or licensed warehouse at the

owner's cost and risk, subject to a lien for the carrier's freight and other charges, the carrier remains liable *qua* carrier during the 48-hour period, pending delivery. P. 430.

2. A carload of goods, upon arrival at destination, was placed upon the railroad's public delivery track, and the consignee, having been notified, accepted the car, broke the seals thereon and proceeded to unload. *Held*, that this did not constitute a delivery of the goods and that a loss of part, occurring during the unloading and within the 48-hour period provided in the bill of lading *ut supra*, par. 1, must be borne by the railroad. P. 431.

291 Illinois, 149, affirmed.

CERTIORARI to review a judgment of the Supreme Court of Illinois affirming a judgment for damages, rendered in favor of the present respondent by the Appellate Court of that State upon an appeal from a contrary judgment of the Municipal Court of Chicago. The facts are stated in the opinion.

*Mr. Frank H. Towner*, with whom *Mr. Ralph M. Shaw* was on the briefs, for petitioner.

*Mr. William B. Moulton*, with whom *Mr. Joseph A. Bates* was on the brief, for respondent.

MR. JUSTICE MCKENNA delivered the opinion of the court.

Action in the Municipal Court of Chicago for damages for loss on several shipments of grapes, four car-lots, shipped in sound and merchantable condition.

On receipt of the shipments bills of lading were issued. The total loss is alleged to have been 126 baskets of grapes of the value of $23.30. The Municipal Court found against plaintiff (respondent here, and it will be so referred to). The judgment was reversed by the Appellate Court, First District of the State, and judgment awarded respondent which was affirmed by the Supreme Court of

the State, to which an appeal was granted because the Court of Appeals considered that the case involved questions of importance "on account of principal and collateral interests" which should be passed upon by the Supreme Court.

Our review is concerned with questions of law; the facts are undisputed. It is stipulated that the cars were transported by the Railroad Company from their respective points of origin to Chicago, arriving there at different days and times of day. Upon the arrival of each car it was placed on a public delivery track of the Railroad Company and notice thereof given. Respondent accepted each car, breaking the seals thereof. And it is stipulated that, at the time respondent started to unload, each of the cars contained the number of baskets and pounds of grapes received for transportation. The loss, whatever there was, occurred after the acceptance of the cars and after their unloading had commenced, and whether the Railroad Company is liable therefor, and in what capacity liable—whether as carrier or warehouseman, or at all—is the question in the case.

The answer depends upon the construction to be given to the first paragraph of section 5 of the bill of lading. It is as follows:

"Property not removed by the party entitled to receive it within forty-eight hours (exclusive of legal holidays) after notice of its arrival has been duly sent or given may be kept in car, depot, or place of delivery of the carrier, or warehouse, subject to a reasonable charge for storage and to carrier's responsibility as warehouseman only, or may be, at the option of the carrier, removed to and stored in a public or licensed warehouse at the cost of the owner and there held at the owner's risk and without liability on the part of the carrier, and subject to a lien for all freight and other lawful charges, including a reasonable charge for storage."

Regarding the words of the section merely, they are clear enough, and present no "double sense." But controversies have arisen and judicial judgments have divided upon them. The point of the controversies has been, and is, as to the relation of the carrier to a shipment within 48 hours after notice of its arrival has been duly sent or given, and the contentions upon the point are in sharp antagonism. That of respondent is that the Railroad Company during the 48 hours is responsible as a carrier, this relation not terminating until the expiration of that time. The contention of the Railroad Company is *contra*, and that it is liable neither as carrier nor as warehouseman,—not as carrier because the shipment had been delivered and accepted—not as warehouseman because no negligence has been proved against it. The Supreme Court decided against the contentions of the Railroad Company and held it liable for loss on all of the shipments. As to three of them we may say immediately, in disposition of them, respondent withdraws any claim on account of them and confines the issue to one car which was undoubtedly unloaded within 48 hours of the notice of its arrival. There is question of the other cars.

The importance of the issue, however, still remains, although it is concerned with only 31 baskets of grapes of the value of $8.68, and the difficulty of its determination is indicated by the fact of the diversity of judicial reasoning upon a like issue in other cases. And counsel have been at pains to set the cases in opposition with approving or disapproving comment of their own.

The differences of the cases cannot be reconciled and a review of them for the purpose of selection would manifestly extend this opinion to a great length. Their outside principle is simple enough; the bill of lading is a contract between the transportation company and him who is interested in the shipment, and legal when

within the policy and edicts of the law regulating that relation.[1]

By recurring to section 5 of the bill of lading, it will be seen that it supposes a contingency and provides for its occurrence. It supposes that property may not be removed when it has reached destination, and is available for delivery, and two periods of time are provided for. One of 48 hours after notice of the arrival of the property has been sent or given. During this time there is no declaration of the relation of the Railroad Company to the property. The other period commences at the expiration of the first or 48-hour period, during which the provision is that the property is subject "to carrier's responsibility as warehouseman only." The comparison has its significance and must be accounted for. Realizing this, the Railroad Company makes a distinction. Its contention is that, where delivery has been made of the property, as it insists was true in the case at bar, the responsibility of the Railroad Company as carrier immediately ceases. If, however, it is neither delivered nor removed within 48 hours after notice of its arrival, the responsibility of the Railroad Company thereafter is that of "warehouseman only."

To the distinction and the contention based upon it the Supreme Court of the State answered that the bill of lading provides for property "not removed"—not to property "delivered" or "not delivered," and it must be taken at its word.

The answer puts too much emphasis upon the distinction between property removed and property delivered.

---

[1] *Texas & Pacific Ry. Co.* v. *Reiss,* 183 U. S. 621; *Kansas City Southern Ry. Co.* v. *Carl,* 227 U. S. 639; *Georgia, Florida & Alabama Ry. Co.* v. *Blish Milling Co.,* 241 U. S. 190; *St. Louis, Iron Mountain & Southern Ry. Co.* v. *Starbird,* 243 U. S. 592; *Missouri, Kansas & Texas Ry. Co.* v. *Ward,* 244 U. S. 383; *Southern Ry. Co.* v. *Prescott,* 240 U. S. 632; *Erie R. R. Co.* v. *Shuart,* 250 U. S. 465.

The property here was not delivered; access was only given to it that it might be removed, and 48 hours were given for the purpose. Pending that time it was within the custody of the Railroad Company, the Company having the same relation to it that the Company acquired by its receipt and had during its transportation.

The bill of lading is definite, as we have pointed out, in its provisions and of the time at which responsibility of the Company shall be that of warehouseman, and by necessary implication, therefore, until that responsibility attaches, that of carrier exists.

All the elements of the case considered and assigned their persuasive force, we think the judgment of the Supreme Court should be and it is

*Affirmed.*

Mr. Justice McReynolds, dissenting:

This cause is important because of what had been said concerning section 5 of the Uniform Bill of Lading, approved and recommended by the Interstate Commerce Commission after much consideration and repeated conferences between carriers and shippers, extending through four years.

In their report, 14 I. C. C. (1908), 346, 348, 349, 350, the Commission said:

"This proposed bill of lading—for the two forms may be considered as one in what we have further to say—is submitted for adoption by the carriers and use by the shipping public with considerable confidence. It is not claimed to be perfect, and experience may develop the need of further modifications, but it represents the most intelligent and exhaustive efforts of those who undertook its preparation to agree upon a bill of lading which should be reasonably satisfactory to the railroads and the public. It is, of course, more or less a compromise between oppos-

ing interests, because on the one hand it imposes obliga-. tions of an important character which carriers have not heretofore assumed, and on the other retains exemptions to which some shippers may object, and perhaps not without substantial reason.   As we are advised, it is in some respects less favorable to the shipper than the local laws or regulations of one or more states, but is more favorable to the shipper than the local laws or regulations of most of the states.   On the whole, it is believed to be the best adjustment which is now practicable of a controversy of long standing which affects the business interests of the entire country.   . . . .   The circumstances under which the work of the joint committee has been conducted and the substantial agreement on most points by the different interests concerned, to say nothing of direct assurances from representatives of the carriers, warrant us in expecting that the assenting roads will adopt the bill upon our recommendation.   We therefore assume that the railroads in Official Classification territory, whose proposed action was the subject of the original investigation, will adopt and use this bill, to the extent above indicated, from and after the date named for that purpose.   We shall also expect that railroad carriers subject to the act outside of Official Classification territory will adopt and use this bill of lading to the same extent and from and after the same date.   There may be peculiar conditions in western and southern territory which require some modifications of or additions to this standard bill, but the desirability of uniform usage is so great and the reasons for it so obvious as to justify the expectation that carriers in western and southern territory will adopt the bill in question to the fullest extent practicable without abridging any just privileges which their shippers now enjoy."

The language in controversy was not selected by the carriers alone; they reluctantly accepted the whole in-

strument rather than dictated it to others. *Texas & Pacific Ry. Co.* v. *Reiss,* 183 U. S. 621, holding that doubtful provisions should be resolved in the shipper's favor, is not applicable. The agreement ought to be construed and applied as one arrived at through deliberate negotiation by intelligent parties seeking to make some definite statement or modification of common-law rules concerning their rights and liabilities.

The carrier acknowledges receipt of "the property described . . . marked, consigned and destined as indicated below, which said carrier (which word is to be understood throughout this bill of lading as meaning any person or corporation in possession of the property under the bill of lading) agrees to carry to its usual place of delivery at said destination, if on its road, otherwise to deliver to another carrier on the route to said destination."

Among other things, section 1 provides:

"The carrier or party in possession of any of the property herein described shall be liable for any loss thereof or damage thereto, except as hereinafter provided. . . . When in accordance with general custom, on account of the nature of the property, or when at the request of the shipper the property is transported in open cars, the carrier or party in possession (except in case of loss or damage by fire, in which case the liability shall be the same as though the property had been carried in closed cars) shall be liable only for negligence, and the burden to prove freedom from such negligence shall be on the carrier or party in possession."

Section 5 follows:

"Property not removed by the party entitled to receive it within forty-eight hours (exclusive of legal holidays) after notice of its arrival has been duly sent or given may be kept in car, depot, or place of delivery of the carrier, or warehouse, subject to a reasonable charge for storage and to carrier's responsibility as warehouseman only, or

may be, at the option of the carrier, removed to and stored in a public or licensed warehouse at the cost of the owner and there held at the owner's risk and without liability on the part of the carrier, and subject to a lien for all freight and other lawful charges, including a reasonable charge for storage."

The Uniform Bill does not purport to specify all rights and obligations of the parties as between themselves, but leaves these as established by law, except when and as otherwise provided. Particularly, it does not undertake to define what shall constitute delivery to the consignee.

"In order to simplify the issues the respondent" confines its claim here to losses from car No. 22049—$8.68. The parties stipulated that this car "arrived in Chicago on October 8, 1914, was placed on a public delivery team track on October 9, 1914, at 8:00 A. M. o'clock; that notice of arrival and placement of said car was given to the plaintiff herein on October 9, 1914, at 9 A. M. o'clock; that plaintiff accepted said car, broke the seals thereon, and started to unload it on October 9, 1914, at 9:30 A. M. o'clock; and that the unloading of said car was completed by the plaintiff on October 9, 1914, at 6 P. M. o'clock. . . . That at the time the plaintiff accepted and started to unload each of said cars, every car contained the same number of baskets and pounds of grapes as were received by the defendant in said car for transportation at the point of origin thereof, named herein, and that at said time the doors of each of said cars were sealed with the same seals intact as were placed on them by the defendant when it received said grapes for transportation."

The circumstances accompanying acceptance and unloading are not revealed except as above stated. Whether these suffice clearly to establish final and complete delivery of possession of the freight to the consignee may be questioned, but mere consideration of the bill cannot

solve the difficulty. If, as matter of fact, the consignee was put into actual possession of the property within forty-eight hours, it must be clear that the carrier's liability as insurer ceased when he accepted control.

What constitutes delivery by a railroad carrier sufficient to change its responsibility from insurer to warehouseman has given occasion for much difference of opinion.

The so-called New York rule, the strictest against the carrier, "is stated to be that if the consignee is present, upon the arrival of the goods, he must take them without unreasonable delay; if he is not present, but lives at or in the immediate vicinity of the place of delivery, the carrier must notify him of the arrival of the goods, and then he must have a reasonable time to remove them; if he is absent, unknown or cannot be found, the carrier may store them; and if, after notice of the arrival of the goods, the consignee has had a reasonable opportunity to remove them, and does not, he cannot hold the carrier longer as an insurer." Hutchinson on Carriers, 3rd ed., § 708.

The Massachusetts rule has been thus stated: "All that could be required of railways was a safe deposit of the goods upon the platform or in the warehouse of the road at the end of the transit, to await delivery to the consignee, when he should call for them, and that from the time of such deposit, even without notice by the carrier to the consignee, the liability of the former was changed from that of common carrier to warehouseman." Hutchinson on Carriers, 3rd ed., § 702.

The New Hampshire rule continues the carrier's liability as insurer until the consignee has had a reasonable time to receive the goods after their arrival at destination. During that period "The servants of the carrier still continue in charge of them. They are equally shut off from observation and the oversight of others as when in transit; and if they are lost, damaged, or purloined, he

has no greater opportunity of ascertaining or proving by whose fault or negligence it was done, than if such loss had occurred during the transportation. Consequently, the same reasons for holding the carrier to extraordinary responsibility during the transportation of the goods exist after their arrival, at least, until the owner or consignee shall have had an opportunity to take them in charge." Hutchinson on Carriers, 3rd ed., § 704.

Undoubtedly, the Uniform Bill was prepared with the above rules in mind. It did not adopt any of them, but left the matter to which they relate for determination by the courts.

It should be noted that the bill acknowledged receipt of property "which said carrier . . . agrees to carry to its usual place of delivery at said destination, if on its road, otherwise to deliver to another carrier on the route to said destination." And further, that "the carrier or party *in possession* of any of the property herein described shall be liable for any loss thereof or damage thereto, except as hereinafter provided."

The special purpose of section 5 was to protect the carrier by placing an extreme limit upon the time during which freight might remain with it without charge for storage; and also to define the carrier's right and obligation thereafter. The unnecessary delay incident to unloading and the undue utilization of railroad cars and warehouses by consignees for storage purposes had seriously hindered prompt movement of freight, and proper employment of equipment. This section does not purport to establish any rule of liability during the forty-eight hours, but leaves that to be determined by application of the common law to the circumstances. To say that a carrier insures for forty-eight hours although the consignee has taken actual custody of the goods would seem an absurd conclusion. And the practical impossibility of stationing an agent at every car within

a great terminal while freight is being removed by thousands of consignees and their agents—a necessary precaution if thefts or mistakes by any one of them must be prevented—makes it manifest that the Interstate Commerce Commission would not have sanctioned the responsibility now claimed and that the carriers would not have acquiesced. I cannot think there was purpose to burden carriers beyond the most stringent of the rules above referred to.

The fair inference from the facts stipulated is that the consignee received possession and control of his goods before the loss occurred. A carrier's responsibility as insurer depends upon exclusive possession and control and must cease when these end. The modified one prescribed by the Uniform Bill for goods shipped in open cars where such possession and control is difficult or impossible to maintain gives practical recognition to the real basis upon which liability rests. Here the car was opened, examined, accepted and apparently thereafter remained in charge of the consignee. Yet, it is said the delivery was not sufficient to terminate liability as insurer but that this continued because of section 5, which in plain terms refers only to removal. It must not be forgotten that we are not dealing here with a question of due care but with the absolute liability of an insurer.

It is not good reasoning to conclude that because an extreme limit is placed upon the time during which freight may remain in a car without charge, therefore the carrier's liability as an insurer continues during such time.

The Uniform Bill is in common use and the opinion of the court will be far-reaching. The subject therefore seems sufficiently important to demand an indication of the reasons which lead me to dissent.