COMPANIA DE VAPORES INSUR-
ANCE CO., S.A.,

and

The Baloise Marine Insurance
Co., Ltd.,

v.

MISSOURI–PACIFIC RAILROAD COM-
PANY, Guy A. Thompson, Trustee,

Texas Pacific-Missouri Pacific Terminal
Railroad of New Orleans.

Civ. A. No. 3915.

United States District Court
E. D. Louisiana, New Orleans Division.

July 25, 1955.

Terriberry, Young, Rault and Carroll, Benjamin W. Yancey, New Orleans, La., for plaintiff.

Miazza and Drury, Kalford Miazza, Dufour, St. Paul and Levy, C. Ellis Henican, New Orleans, La., for defendants.

CHRISTENBERRY, Chief Judge.

This case having been tried by the Court without a jury, the Court makes the following findings of fact and conclusions of law:

### Findings of Fact

#### I.

(a) The Baloise Marine Insurance Co., Ltd., one of plaintiffs, is a corporation organized under the laws of Switzerland.

(b) Compania de Vapores Insurance Co., S.A., one of plaintiffs, is a corporation organized under the laws of the Republic of Cuba.

(c) The Chrysler Corporation, one of plaintiffs, is a corporation organized under the laws of the State of Michigan.

(d) Compania Importadora de Autos y Camiones, S.A. and Compania de Autos y Transportes, S.A., both plaintiffs, are corporations organized under the laws of the Republic of Cuba.

## II.

(a) The Missouri Pacific Railroad Company, one of defendants, is a corporation organized under the laws of the State of Missouri.

(b) Guy A Thompson, trustee of Missouri Pacific Railroad Company, one of defendants, is a resident of the City of St. Louis, State of Missouri.

(c) Texas Pacific-Missouri Pacific Terminal Railroad, of New Orleans, one of defendants, is a corporation organized under the laws of the State of Louisiana.

## III.

There is diversity of citizenship between the plaintiffs and defendants, as contemplated by the Federal Statute, and the amount in controversy far exceeds the necessary jurisdictional amount.

## IV.

At all material times, the plaintiffs and defendants, respectively, were engaged as follows:

(a) The Baloise Marine Insurance Co. Ltd. (hereinafter sometimes referred to as "Baloise"), was duly qualified and was engaged in the business of writing insurance.

(b) The Compania de Vapores Insco, S.A. (hereinafter sometimes referred to as "Insco"), was engaged in the business of carrying cargo and other merchandise, for hire, in ships between the Port of New Orleans and one or more Ports in the Republic of Cuba.

(c) The Chrysler Corporation was engaged in the business of manufacturing and selling Chrysler products, including automobiles and trucks, more particularly under the names of "Chrysler", "Plymouth", "DeSoto", and "Dodge" automobiles and trucks and accessories, with its principal manufacturing plant located in Detroit, State of Michigan.

(d) Compania Importadora de Autos y Camiones, S.A. (hereinafter sometimes referred to as Compania Importadora), and Compania de Autos y Transportes, S.A. (hereinafter sometimes referred to as Compania Transportes), were engaged in the business of distributing Chrysler products in the Republic of Cuba.

(e) Missouri Pacific Railroad Company and Guy A Thompson, Trustee of Missouri Pacific Railroad Company, were operating as a common carrier by rail throughout various sections of the United States under tariffs duly promulgated.

(f) The Texas Pacific-Missouri Pacific Terminal Railroad of New Orleans (hereinafter sometimes referred to as MP–TP Terminal), was operating a terminal warehouse at Westwego, Louisiana, and its charges were covered by duly promulgated tariffs.

## V.

On various dates during the month of March, 1952, the Chrysler Corporation at Detroit, Michigan, shipped via the New York Central Railroad Company and connecting carriers, including Missouri Pacific Railroad Company, approximately 250 Plymouth, Dodge and Chrysler automobiles and trucks, with appurtenances and accessories, for carriage to Westwego, Louisiana.

## VI.

The said automobiles, trucks and accessories were, when delivered to the New York Central Railroad Company, in good order and condition consigned to D. C. Andrews & Co. (a freight forwarding firm acting for either the Chrysler Corporation or Insco) at Westwego, Louisiana, for delivery to the Intercontinental Shipping Corporation as agent for Insco, the same to be carried from New Orleans to Havana, Cuba, in Insco's vessels.

## VII.

Some of the said automobiles, trucks and accessories had been sold by the Chrysler Corporation to Compania Importadora and the remainder had been sold to Compania Transportes.

## VIII.

The New York Central Railroad Company, upon receiving each said shipment, issued through bills of lading to the Chrysler Corporation, under which bills of lading the said railroad, as well as its connecting carriers (including the Missouri Pacific Railroad Company, as main line haul and delivering carrier) undertook to transport the said shipments to Westwego, Louisiana, and there to deliver them in the same good order and condition, in accordance with the provisions in the bills of lading and in the applicable tariffs.

## IX.

The Chrysler Corporation paid the freight charges on each shipment, all in accordance with the prevailing tariffs.

## X.

All of the said shipments reached Westwego, Louisiana, prior to April 3, 1952, and (with the exception of certain inconsequential damage that apparently occurred in transit and which is not involved in this litigation) the said automobiles, trucks and accessories were delivered in good order and condition to the TP–MP Terminal Company. Whereupon, the said shipments were unloaded from the freight cars and thereafter were placed on the docks and in the warehouses of the TP–MP Terminal.

## XI.

(a) The warehouse facilities of the TP–MP Terminal were situated on the West bank of the Mississippi River at Westwego, Louisiana. These facilities consisted of frame construction, with built-up composition roof enclosed on the sides with corrugated iron sheeting, with openings at various points for ingress and egress, and with brick fire walls between Berth No. 1 and Berth No. 2 of Wharf No. 1; (2) Berth No. 2 and Berth No. 3 of Wharf No. 1; (3) Wharf No. 2 and Wharf No. 3; and at the eastern end of Wharf No. 2.

(b) From one end to the other the facilities measured approximately 2,600 feet along the river by depths ranging from approximately 136 feet to 168 feet.

(c) This warehouse facility was divided into sections identified as "Wharf No. 1, Berths 1, 2 and 3"; "Wharf No. 2", and "Wharf No. 3". These warehouses were built from about 1892 through 1916; and thereafter the TP–MP Terminal used its regularly employed maintenance crew under the supervision of a regularly employed foreman and of its chief engineer, to provide the necessary replacement and upkeep.

## XII.

On or about June 10, 1952, Baloise issued its policy B–OC002 in favor of Compania Importadora and/or the Royal Bank of Canada and/or the Chrysler Corporation, effective March 1, 1952, for $200,000 coverage on automobiles, trucks and accessories, etc. shipped from any part of the U. S., to any place in Cuba. In this connection, a binder was issued on or about February 18, 1952, and the policy included a Warehouse to Warehouse clause, Marine Extension clauses, Institute Cargo clauses, a Both-to-Blame Collision clause and the usual full conditions, subject to a deductible of $150 as respects any one vehicle.

## XIII.

Baloise also issued its policy B–OC003 in favor of Compania Transportes, the said policy having the same provisions, endorsements, date and effective date as the last mentioned policy.

## XIV.

While the said automobiles, trucks and accessories were located in the warehouses of the TP–MP Terminal Co., a severe weather disturbance occurred on April 4, 1952, at about 5:00 o'clock A.M.

## XV.

As a result of the said weather disturbance, the warehouses of the TP–MP

Terminal Co. were seriously damaged and/or destroyed.

## XVI.

As a result of the said weather disturbance and/or damage to and/or destruction of the said warehouses, 150 of the aforementioned automobiles and trucks and some, if not all, of said accessories, were damaged.

## XVII.

By a stipulation filed in the record, the nature and extent of all of the physical damages to the automobiles, trucks and accessories were agreed upon, with the exception of the alleged damage to six certain units and certain claims for expenses growing out of the occurrence.

(a) According to the said stipulation, Compania Importadora's loss amounted to $16,367.08; and it also claimed (1) an additional $2,016 for two of the six units upon which the parties did not stipulate; and (2) $799.50 representing the cost of sending its General Manager from Havana, Cuba, to New Orleans, Louisiana, in order to inspect the damage, to arrange for its repair and to otherwise protect its interests; or a total alleged loss of $19,182.58.

(b) According to the said stipulation, Compania Transportes' loss amounted to $13,634.23; and it also claimed (1) an additional $4,111.05 for four of the six units upon which the parties did not stipulate; and (2) $815 representing the cost of sending its general manager to inspect the damage, arrange for its repair and otherwise protect its interests; or a total alleged loss of $17,745.28.

(c) Of the loss claimed by Compania Importadora, Insco allegedly advanced, against the anticipated recovery in this suit, to Compania Importadora, the sum of $9,636.24; and Baloise allegedly advanced, under the same terms and conditions, to Compania Importadora the sum of $8,746.84.

(d) Of the loss claimed by Compania Transportes, Insco allegedly advanced against the anticipated recovery in this suit, to Compania Transportes, the sum of $7,870.11; and Baloise allegedly advanced, under the same terms and conditions, to Compania Transportes the sum of $9,875.17. Moreover, Baloise claims an additional $354.14 representing the cost of sending its representative from Havana to investigate, survey and take proper steps to minimize the damage.

## XVIII.

The bills of lading under which the several shipments were transported contained, among others, the following pertinent provisions:

"Section 1(a). The carrier or party in possession of any of the property herein described shall be liable as at common law for any loss thereof or damage thereto, except as hereinafter provided.

"(b). No carrier or party in possession of all or any of the property herein described shall be liable for any loss thereof or damage thereto or delay caused by the Act of God, the public enemy, the authority of law, or the act or default of the shipper or owner, or for natural shrinkage. The carrier's liability shall be that of warehouseman, only, for loss, damage or delay caused by fire occurring after the expiration of the free time allowed by tariffs lawfully on file (such free time to be computed as therein provided) after notice of the arrival of the property at destination or at the port of export (if intended for export) has been duly sent or given, and after placement of the property for delivery at destination, or tender of delivery of the property to the party entitled to receive it, has been made. Except, in case of negligence of the carrier or party in possession (and the burden to prove freedom from such negligence shall be on the carrier or party in possession), the carrier or party in possession shall not be liable for loss, damage or delay occurring while the property is stopped and held in transit upon the request of the shipper, owner or

party entitled to make such request, or resulting from a defect or vice in the property, or for country damage to cotton, or from riots or strikes.

\* \* \* \* \* \*

"Section 4(a). Property not removed by the party entitled to receive it within the free time allowed by tariffs, lawfully on file (such free time to be computed as therein provided), after notice of the arrival of the property at destination or at the port of export (if intended for export) has been duly sent or given, and after placement of the property for delivery at destination has been made, may be kept in vessel, car, depot, warehouse or place of delivery of the carrier, subject to the tariff charge for storage and to carrier's responsibility as warehouseman, only, or at the option of the carrier, may be removed to and stored in a public or licensed warehouse at the place of delivery or other available place, at the cost of the owner, and there held without liability on the part of the carrier, and subject to a lien for all freight and other lawful charges, including a reasonable charge for storage."

### XIX.

Prior to the time that the automobiles, trucks and accessories were placed on the docks and in the warehouses of the TP–MP Terminal, they were subject to Central Territory Freight Tariff 130–C I.C.C. 3926 and Central Freight Association Freight Tariff 548–D I.C.C. 4058 and 93.

### XX.

After the placement of said automobiles, trucks and accessories upon the docks and in the warehouses of the TP–MP Terminal, the said shipments were also subject to the provisions of Emerson's Tariff 4–Z I.C.C.

(a) Although prompt and proper notices were given by the carrier in accordance with the bills of lading and tariffs, all of the shipments were within the free time allowed under the tariffs up to the time of the weather disturbance on April 4, 1952.

(b) After the weather disturbance, those vehicles that were permitted to remain on the docks and in the warehouses of the TP–MP Terminal after the expiration of free time were charged storage charges in accordance with Emerson's Tariff; and these amounts were paid.

(c) Item 10 of Emerson's Tariff provides:

"These lines under this Tariff have no obligation to provide storage or handling for property which has not been transported nor is intended to be transported to or from the ports over their lines; and as to the property which has been transported, or is intended to be transported over their lines, have no obligation to provide storage or handling services beyond reasonable capacity of their property and facilities. \* \* \*"

### XXI.

The weather disturbance that occurred on April 4, 1952, was the direct and proximate cause of the damage to or destruction of the warehouses of the TP–MP Terminal, which damage and destruction immediately resulted in the damage to or destruction of the automobiles, trucks and accessories on account of which the claims in this suit are based.

### XXII.

As a result of the said weather disturbance and the said damages, the warehouses of the TP–MP Terminal had to be repaired and/or rebuilt, the evidence being that the reasonable cost of repairing Wharf No. 1 was approximately $245,000, and Wharves Nos. 2 and 3 approximately $180,000.

### XXIII.

The weather disturbance that occurred on April 4, 1952, was either a small tornado or a line squall with tornadic characteristics; and the warehouses of the TP–MP Terminal, in which the said automobiles, trucks and accessories were

stored, were in the direct path of the said weather disturbance.

### XXIV.

The said weather disturbance was not predicted by anyone, the representatives of the TP–MP Terminal had no prior warning of the approach of the said weather disturbance, and the disturbance itself struck quickly, and without any opportunity on the part of the employees of the TP–MP Terminal to take any precautionary measures.

### XXV.

The said weather disturbance, although of short duration, was of sufficiently unusual intensity to account for the serious damage and destruction which actually occurred to the warehouses of the TP–MP Terminal; and the evidence shows that there was other devastating damage and destruction within the path of the said weather disturbance, including damage to sections of the Huey P. Long Bridge, the demolition of the WTPS Steel Radio Tower at Gretna, La., the destruction of a brick commercial chimney at an alcohol plant, the turning over and demolition of frame houses at Bridge City, and the serious damage to and/or destruction of two large warehouses in Gretna, Louisiana.

### XXVI.

The said weather disturbance was not a seasonal fresh squall as occurs in the spring season in the New Orleans area; and it was not the kind of a disturbance which builders and architects usually anticipate in the design and construction of buildings in this area.

### XXVII.

The anemometer on one section of the Huey P. Long Bridge, which was not within the defined path of the disturbance (but which was in the vicinity thereof) showed the intensity of the wind to have reached 90 miles per hour. The path of the wind disturbance was quite large in its lateral area and was recorded as a "tornado" in various portions of the State of Louisiana through which it passed. The intensity of the wind velocity was far in excess of the wind velocities which accompanied the hurricane disturbance in the New Orleans area in 1947; and the average monetary damage to various insured properties within the defined path of the wind disturbance (of April 4, 1952) in the New Orleans area was in excess of the average monetary damage of insured property in the New Orleans area which was occasioned in the hurricane of 1947.

### XXVIII.

The said wind disturbance was either a tornado or a line squall with tornadic characteristics; and the wind velocity within the path of the disturbance exceeded the rate of 90 miles per hour recorded at the Huey P. Long Bridge, and probably exceeded 100 miles per hour.

### XXIX.

The docks and warehouses of the TP–MP Terminal in which were the automobiles, trucks and accessories at the time of the aforementioned wind disturbance and damage were sound and in good order, repair and condition.

### XXX.

The said docks and warehouses were regularly inspected for deterioration, were maintained by repairs and replacements, when necessary, by a regularly employed crew of qualified laborers under the supervision of a competent foreman, who, in turn, was under the supervision of the Chief Engineer of the TP–MP Terminal. During the 10 years preceding the said weather disturbance, the TP–MP Terminal expended several hundred thousand dollars on the repair and maintenance of its said docks and warehouses.

### XXXI.

Although the warehouses were old, they were sound, were kept in reasonably good condition, and from a reasonably prudent inspection, there was no apparent deterioration. Moreover, the structure had withstood other severe wind disturbances, for example, the hurricane of 1947, with negligible damage.

Therefore, there was no reasonable basis for the TP–MP Terminal to have considered the warehouses unsound or inadequate.

### XXXII.

The condition of the warehouses did not contribute to the damage or loss claimed by plaintiffs; and no fault (either by acts of commission or omission) on the part of the agents, servants or employees of the TP–MP Terminal has been established. On the contrary, the preponderance of the evidence affirmatively shows the absence of any such fault.

### Conclusions of Law

#### I.

This Court has jurisdiction of this proceeding. 28 U.S.C.A. § 1332.

#### II.

At the time of the damage, the automobiles, trucks and accessories which were located at the warehouses of the TP–MP Terminal were in the custody of the defendants as common carriers. Michigan Central v. Owen & Co., 256 U.S. 427, 41 S.Ct. 554, 65 L.Ed. 1032; Southern Railway Co. v. Prescott Co., 240 U.S. 632, 36 S.Ct. 469, 60 L.Ed. 836.

#### III.

■ Upon proof of delivery of goods to the carrier in good condition, and of delivery by the carrier in bad condition, the carrier had the burden of establishing, by a reasonably fair preponderance of the evidence, that the damage resulted from a cause for which the carrier is exempted by law or by a valid provision of the Bill of Lading or in the applicable tariff. Chesapeake & O. Ry. Co. v. A. F. Thompson Manufacturing Co., 270 U.S. 416, 46 S.Ct. 318, 70 L.Ed. 654; Galveston H. & S. A. Ry. Co. v. Wallace, 223 U.S. 481, 32 S.Ct. 205, 56 L.Ed. 516; Reider v. Thompson, 5 Cir., 197 F.2d 158, 161; Flota Mercante Del Estado v. Orient Ins. Co., 5 Cir., 198 F.2d 740.

#### IV.

■ Where damage to a shipment is caused by an act of God, the carrier is excused thereby from liability for the loss, unless the carrier is concurrently negligent. Memphis & C. R. Co. v. Reeves, 10 Wall. 176, 77 U.S. 176, 19 L.Ed. 909.

#### V.

■ A tornado or a line squall with tornadic characteristics (such as the weather disturbance, the proof of which was established in this case) is to be classed among the acts of God which no human power can prevent or avert. Mistrot-Callahan Co. v. Missouri, K. & T. Railroad Co. of Texas, Tex.Civ.App., 209 S.W. 775; Western Millers Mut. Fire Ins. Co. v. Thompson, D.C., 95 F.Supp. 993, 997.

#### VI.

Where a carrier proves, by a preponderance of evidence, that an alleged loss resulted from an act of God (such as the weather disturbance that occurred in this case) and the evidence further shows that the carrier was in no way negligent, the carrier is not liable for the said loss. Memphis & Charleston Railroad Co. v. Reeves, 10 Wall. 176, 19 L.Ed. 909; Morrison v. Davis, 20 Pa. 171; Denny Co. v. New York Cent. R. Co., 13 Gray 481.

#### VII.

■ After the establishment of the defense of an act of God, the carrier has the burden of proceeding by establishing by a preponderance of the evidence the absence of any negligence on its part which might have contributed to the occurrence of the loss or damage. East Tenn. V. & G. R. Co. v. Johnston, 75 Ala. 596; Agnew v. The Contra Costa, 27 Cal. 425; McGrath v. Northern P. R. Co., 121 Minn. 258, 141 N.W. 164, L.R.A. 1915D, 644.

#### VIII.

■ The defendants in this case have proved to the satisfaction of this Court that at the time of the aforementioned weather disturbance the warehouses of the TP–MP Terminal were sound, and that the condition of the warehouses did not in any wise contribute to the damage to or destruction of the said warehouses by the severe wind which struck them on

the morning of April 4, 1952. Accordingly, the defense of an act of God, namely, the wind disturbance that defendants proved to have occurred was the proximate and sole cause of the damage to or destruction of plaintiffs' automobiles, trucks and accessories.

## IX.

Consequently, the defendants are excused from their failure to have delivered the said automobiles, trucks and accessories in the same good order in which they were received at the point of shipment.

## X.

Accordingly, there will be judgment in favor of the defendants, dismissing the suit of the plaintiffs at the cost of plaintiffs.

Let a judgment be prepared in accordance with these findings.