Argued February 3, affirmed March 18, 1964

# TIMBER STRUCTURES, INC. *v.* SOUTHERN PACIFIC COMPANY

390 P. 2d 343

*Garry P. McMurry,* Portland, argued the cause for appellant. With him on the briefs were Krause, Lindsay & Nahstoll, Portland.

*Kaye C. Robinette,* Portland, argued the cause for respondent. With him on the brief were Wayne Hilliard and Koerner, Young, McColloch & Dezendorf, Portland.

Before McAllister, Chief Justice, and Rossman, Perry, O'Connell, Goodwin, Denecke and Lusk, Justices.

O'CONNELL, J.

This action is brought against an originating carrier engaged in interstate commerce to recover damages for the loss of plaintiff's goods as a result of fire while the goods were in one of the freight cars

of a connecting carrier. The jury returned a verdict
for the defendant. Plaintiff appeals from judgment
on the verdict.

■■ On June 25, 1960 plaintiff shipped wooden
beams and connecting hardware from Portland, Ore-
gon, to Port Ewen, New York. The shipment was pre-
paid and originated on defendant's railroad line. A
uniform straight bill of lading was issued by defendant
and listed the New York Central System as the ter-
minating carrier which would make delivery at Port
Ewen. The shipment was subject to all the terms and
conditions of the bill of lading and certain provisions
of the freight tariff 4-D ICC 4808.① Port Ewen is a

---

① Title to Freight Tariff.
"Car Demurrage Rules and Charges, Freight Tariff 4-D ICC
4808, Effective January 1, 1958."

Rule 2, Section A—Free Time Allowed:
"1. Except as otherwise provided in paragraph 3 * * * of
this section, forty-eight hours' (two days) free time will be
allowed to partly or completely * * * unload, * * *."

Rule 2, Section C:
"* * * no free time will be allowed on cars received from
another railroad and held by this railroad for forwarding di-
rections, except that cars received between 4:00 P.M. and 7:00
A.M. will not be subject to demurrage if forwarding directions
are received prior to the following 12:00 Noon (exclusive of
Saturdays, Sundays and holidays) * * *."

Preamble Note to Rule 3—Computing Time:
"(150) For the purpose of computing time under these Rules,
Saturdays, Sundays and holidays (See Item 25) will be ex-
cluded * * *."

Rule 3, Section C:
"1. On cars held for unloading, * * * time will be com-
puted from the first 7:00 A.M. after placement on public-
delivery tracks, and after notice of arrival is sent or given to
consignee or party entitled to receive same. If car is not
placed within 24 hours from the first 7:00 A.M. after notice
of arrival had been sent or given, time will be computed from
the first 7:00 A.M. after notice of placement has been sent
or given to the consignee or party entitled to receive same."

"nonagency station," i.e., one where the railroad does not have personnel in charge.[②]

The two cars carrying plaintiff's shipment were shunted onto the Port Ewen siding on Tuesday, July 12, 1960. On Wednesday, July 13, 1960, plaintiff's job foreman was notified of the cars' arrival at Port Ewen. On Friday, July 15, 1960, plaintiff and five workmen unloaded part of the beams. On Sunday, July 17, 1960, a fire broke out in the railroad car containing the remaining beams.

Under common law principles of bailment it is clear that defendant ceased to be a bailee when plain-

---

Rule 4—Notification—Item 615-C, Section A:

"* * * notice of arrival shall be sent or given consignee or party entitled to receive same by this railroad's agent, in writing, or in lieu thereof, as otherwise agreed to in writing by this railroad and consignee within twenty-four hours (exclusive of Saturdays, Sundays and holidays) (See Item 25 of tariff) after arrival of car and billing at destination, such notice to contain car initials and number, point of shipment, contents and, if transferred in transit, the initials and number of original car. * * *"

Rule 7 (150) Section A:

"On cars not subject to Rule 9, Average Agreement, shown on pages 55 to 57, and for detention not subject to Rule 8, Section G, page 54, after the expiration of free time allowed or without free time allowance, when none is provided, the following demurrage charges per car per day, or fraction of a day will be made until car is released:

"$4.00 for each of the first four days,

"$8.00 for each subsequent day,

"and the applicable demurrage charge will accrue on all Saturdays, Sundays and holidays (See Item 25) subsequent to the second chargeable day including a Saturday, Sunday or holiday (See Item 25) immediately following the day on which the second chargeable day begins to run except as otherwise provided in Rule 6, Section B, page 50, and Rule 8, pages 51 to 55."

[②] It is not necessary that the consignor or consignee have notice that the destination station has no regularly appointed agent. Tamsett v. Hines, 207 Ala 97, 91 So 788, 22 ALR 875 (1921).

tiff assumed control over the railroad car and its contents after the car was left at the Port Ewen siding. It is equally clear that defendant is regarded as an insurer until the goods are "delivered." The matter is complicated, however, by the fact that the common law principles of bailment, particularly the principle relating to the termination of a bailment, have been modified by contract embodied in the uniform bill of lading. Under the Interstate Commerce Commission rules relating to demurrage, the consignee is given a designated period of time, described as "free time," within which to remove the goods from the railroad car without demurrage charges.[9]

The bill of lading also provides that:

"* * * Sec. 4 (a) Property not removed by the party entitled to receive it within the free time allowed by tariffs, lawfully on file (such free time to be computed as therein provided), after notice of the arrival of the property at destination or at the port of export (if intended for export) has been duly sent or given, and after placement of the property for delivery at destination has been made, may be kept in vessel, car, depot, warehouse or place of delivery of the carrier, subject to the tariff charge for storage and to carrier's responsibility as warehouseman, only, or at the option of the carrier, may be removed to and stored in a public or licensed warehouse at the place of delivery or other available place, at the cost of the owner, and there held without liability on the part of the carrier, and subject to a lien for all freight and other lawful charges, including a reasonable charge for storage."

---

[9] Rule 2, Section A—Free Time Allowed: "1. Except as otherwise provided in paragraph 3 * * * of this section, forty-eight hours' (two days) free time will be allowed to partly or completely unload, * * *."

In *Michigan Central R. Co. v. Owen & Co.*, 256 US 427, 41 S Ct 554, 65 L Ed 1032 (1921) substantially the same provision was construed to mean that the carrier's liability as an insurer continues during the free time period even though the consignee accepts the car, breaks the seal, and starts unloading operations.[4]

Plaintiff contends that the principle laid down in *Michigan Central R. Co. v. Owen & Co.*, supra, is controlling in the case at bar. To make the *Michigan Central R. Co.* case apposite plaintiff must show that the loss occurred during free time. Here the car was delivered on Tuesday. The free time period began on Wednesday and terminated at the end of Thursday. Friday was not a free day. There was no demurrage charge for Saturday and Sunday because under the Interstate Commerce Commission rules no demurrage charge is made for Saturday and Sunday unless two chargeable days precede the weekend.[5]

Defendant argues that since Rule 2, Section A of the I.C.C. rules expressly provide that only forty-eight hours free time is allowed, the nonchargeable period on Saturday and Sunday is not free time although admittedly excluded time. Defendant's distinction between "free time" and "excluded days" is made in a chart contained in an Interstate Commerce Commis-

---

[4] The court was aided in this interpretation by contrasting what is now Section 4 (a) with another provision of the uniform bill of lading which is now found in Section 1 (b): "* * * The carrier's liability shall be that of warehouseman only, for loss, damage, or delay caused by fire occurring after the expiration of the free time * * *."

[5] Rule 7 (150) Section A: "* * * the applicable demurrage charge will accrue on all Saturdays, Sundays and holidays * * * subsequent to the second chargeable day including a Saturday, Sunday or holiday * * * immediately following the day on which the second chargeable day begins to run except as otherwise provided * * *."

sion report, although the report does not disclose whether the distinction was intended to be of importance in determining the carrier's liability for the loss of goods hauled by it.

■ Although we are inclined to accept defendant's argument that Sunday was not within the free time period, it is not necessary for us to decide that question because we are of the opinion that even if the loss occurred during free time the defendant is not liable in the present case.

■■ We regard Section 4 (f) of the Uniform Bill of Lading as the controlling section in this case. That section provides:

> "Property destined to or taken from a station, wharf or landing at which there is no regularly appointed freight agent shall be entirely at risk of owner after unloaded from cars or vessels or until loaded into cars or vessels, and, except in case of carrier's negligence when received from or delivered to such stations, wharves or landings shall be at owner's risk until the cars are attached to and after they are detached from locomotive or train or until loaded into and after unloaded from vessels."

Section 4 (f) places the risk of loss upon the owner after the car is detached at a nonagency station. That was the situation in the case at bar. We construe the section to mean that under the circumstances described the carrier ceases to be a bailee. The carrier has no liability "except in case of carrier's negligence" which, we think, refers to the negligence of the carrier not in its status as a bailee but as any other person who causes a loss through his negligent conduct.

*Michigan Central R. Co. v. Owen & Co.,* supra, does not hold to the contrary. There the car was "placed

on a public delivery track of the railroad company and notice thereof given.'' We regard this as a reference to an agency rather than a nonagency station. Although the court did not distinguish between an agency and a nonagency station in stating the rule in that case, the distinction was recognized in *Yazoo & Mississippi Valley R. Co. v. Nichols & Co.,* 256 US 540, 41 S Ct 549, 65 L Ed 1081 (1921), decided the same day. In that case the loss occurred at an agency station. The carrier argued that what is now Section 4 (f) was applicable. The court, in holding that the section applied only to nonagency stations, said:

"Whether goods destroyed, lost, or damaged while at a railroad station were then in the possession of the carrier as such, so as to subject it to liability in the absence of negligence, had, before the adoption of the uniform bill of lading, been the subject of much litigation. At stations where there is a regularly appointed agent the field for controversy could be narrowed by letting the execution of a bill of lading or receipt evidence delivery to and acceptance by the carrier; and by letting delivery of goods to the consignee be evidenced by surrender of the bill or execution of a consignee's receipt. But at nonagency stations this course is often not feasible. There the field for controversy as to the facts was particularly inviting and the reasons persuasive for limiting the carrier's liability. Local freight trains are often late. Shippers or consignees cannot be expected to attend on their arrival. Less than carload freight awaiting shipment must ordinarily be left on the station platform, to be picked up by the passing train, and lots arriving must be dropped on the platform, to be called for by the consignee. At such stations the situation in respect to carload freight is not materially different. And this is true whether the car be loaded for shipment on the public siding or on a neighboring private siding, and whether the ar-

riving loaded car be shunted onto a public siding or a private siding. There carload, as well as less than carload, freight, whether outgoing or incoming, must ordinarily be left unguarded for an appreciable time. It is not unreasonable that shippers at such stations should bear the risks naturally attendant upon the use. The reason why an agent is not appointed is that the traffic to and from the station would not justify the expense. The station is established for the convenience of shippers customarily using it. And the paragraph here in question was apparently designed to shift the risk from the carrier to shipper or consignee of both classes of freight." 65 L Ed at 1083-84.

In view of this explanation of the purpose of the section it is not reasonable to treat the *Michigan Central R. Co.* case as holding that the carrier is subject to the same liability during free time whether the loss occurs at an agency or a nonagency station.

Our interpretation of Section 4 (f) has some support in the cases.[6] We recognize that there are cases to the contrary.[7]

■ Plaintiff argues that under the provisions of the bill of lading and the tariff regulations defendant should be held to be at least a warehouseman. We do not agree. Section 4 (f) clearly states that under the circumstances there described the goods are "at the owner's risk." We consider this as a clear indication that the carrier was not to be regarded as a warehouseman under the circumstances described. In those situ-

[6] Yazoo & Mississippi Valley R. Co. v. Nichols & Co., 256 US 540, 41 S Ct 549, 65 L Ed 1081 (1921); Tamsett v. Hines, 207 Ala 97, 91 So 788, 22 ALR 875 (1921). See also Smithwick v. Illinois Cent. R. Co., 202 Miss 868, 32 So2d 862 (1947).

[7] Red River Cotton Oil Co. et al v. Texas & Pac Ry Co., 216 La 519, 44 So2d 101 (1949), certiorari denied, 339 US 953, 70 S Ct 841, 94 L Ed 1366.

ations in which the carrier is to have liability of a warehouseman, the bill of lading so states.[9] If the same liabiilty was intended to be imposed upon the carrier under Section 4 (f), the section would have so stated.

Our conclusion disposes of the assignments of error predicated upon the assumption that defendant was either an insurer or a warehouseman. The remaining assignment of error is without merit.

The judgment of the lower court is affirmed.

[9] See for example Sections 1 (b) and 4 (a).