**GENERAL ELECTRIC COMPANY, to its own use and to the Use of Insurance Company of North America,**

v.

**ACME FAST FREIGHT, INC.**

v.

**PERRY TRANSFER COMPANY, Inc.**

Civ. A. No. 20476.

United States District Court,
D. Maryland.

March 16, 1971.

Philip O. Roach, Baltimore, Md., for plaintiff.

Randall C. Coleman, George T. Tyler and Donald C. Greenman, Baltimore, Md., for defendant and third party plaintiff.

Herbert F. Murray and Michael A. Pretl, Baltimore, Md., for third party defendant.

NORTHROP, Chief Judge.

General Electric Company has brought this action against Acme Fast Freight, Inc. to recover the value of 86 stereo sets which were shipped from the General Electric Company facility at Decatur, Illinois, to the General Electric warehouse on Quad Avenue in Baltimore, Maryland.

Acme Fast Freight has filed a third party claim against Perry Transfer Company, Inc., third party defendant, contending that if recovery is had against Acme, Perry Transfer Company, with whom Acme had a contract in Baltimore to deliver to consignees in the Maryland area, must indemnify Acme.

The facts which gave rise to this action are not in dispute and were largely stipulated to in the pretrial order entered into by the parties.

The parties stipulated that on September 26, 1966, General Electric Company delivered 86 stereo sets to Acme Fast Freight at Decatur, Illinois, for transportation to Baltimore, with delivery to the General Electric Company at 6500 Quad Avenue; that the cargo was loaded in a trailer furnished by Acme; that the trailer was then transported by rail in what is known as a piggyback operation to Baltimore; that Perry picked up the trailer at the B & O piggyback yard for delivery to General Electric, and that at the time it was so picked up the cargo was intact, as when shipped.

It is also stipulated that the stereo sets were delivered to the General Electric warehouse in Baltimore on September 30, 1966, and were stolen sometime between that date and the early morning of October 3, 1966.

It was further stipulated that the trailer, having been picked up by Perry, arrived at General Electric's warehouse sometime after the noon hour on Friday, September 30, 1966, and that there was some discussion in reference to accepting it at that time between Stanley J. Leonard, the supervisor of General Electric in charge of the warehouse, and Perry's driver, Mr. Druen; it is also stipulated and testified to in this case that the driver of the Perry tractor, Mr. Druen, telephoned Mr. Perry and stated that he was having some trouble in effecting a delivery, and after some discussion, Mr. Leonard, the supervisor, and Mr. Rye, the receiving clerk at General Electric's Quad Avenue warehouse, agreed to have the trailer backed up to a bay and the doors were opened and the seal broken, so that unloading could take place early on the morning of October 3, 1966, by General Electric employees.

It was also stipulated that Mr. Perry called Acme in Decatur, Illinois. He was told he could "drop" the trailer off at the General Electric warehouse, but to get a receipt.

Plaintiff has clearly stated that he permitted the trailer to be left at the warehouse to be unloaded at plaintiff's convenience early Monday morning. The hickey nail and seal which held the doors of the trailer closed were broken, the pins of the door were taken off, the doors were swung back, made fast, and the trailer was placed flush against the bay and overhead doors so that access could be had to that trailer by the General Electric employees from within the warehouse Monday morning.

The following Monday morning, the trailer was found to have been stolen and, while the vehicle was subsequently recovered, the stereo sets were not.

The contention of plaintiff, General Electric, is that Acme did not furnish it, the consignee, with previous notice of the arrival of the trailer, or intention to deliver the stereo sets, and that when they arrived at the General Electric warehouse plaintiff's employees were

not in a position to receive the load due to other loading and unloading commitments; and that, under the circumstances, Acme is liable for the loss as no delivery was effected.

Defendant and third party plaintiff, Acme, contends that there was a delivery to and an acceptance by General Electric because General Electric instructed Perry and agreed to the trailer being left on its premises, and one of General Electric's employees assisted the driver in breaking the seals on the door of the trailer, opening the doors, so that the cargo would be ready for unloading.

Acme also contends that if it is liable to plaintiff, then third party defendant, Perry Transfer, must indemnify Acme.

Third party defendant, Perry Transfer, contends that delivery was effected and that Acme and Perry were no longer responsible for the cargo.

Third party defendant also contends that even if Acme is liable to plaintiff, it is not liable to Acme because when its driver was advised on Friday that General Electric was not in a position to unload the stereo sets, he sought and obtained the authorization and instruction of Acme to leave the trailer at the General Electric warehouse for unloading early Monday morning. Perry further contends that Acme waived any contractual rights when it consented to Perry's leaving the trailer at General Electric's warehouse.

Certain documents have been introduced in evidence in the trial of this case, consisting of nine exhibits offered by plaintiff, Seven through Nine consisting of photographs of the General Electric warehouse in Baltimore, and the others being the bill of lading, freight classifications, and supplements to certain tariffs.

Defendant filed two exhibits: (1) the contract between Perry and defendant-third party plaintiff, Acme, and (2) a supplement to a tariff upon which they rely.

The plaintiff's principal contention is that the bill of lading governing the shipment of the stereos placed the risk of loss upon the carrier, Acme Fast Freight. Specifically, plaintiff contends that section 4(a) of the bill of lading continued the carrier's liability as such for a period of 48 hours, exclusive of Saturdays, Sundays and holidays, after notice of arrival of the property at destination had been given and after placement for delivery at destination had been made.

This contention is that it matters not whether the consignee even commences unloading and partially completes unloading and exercises even that degree of dominion over a cargo; that liability of the carrier remains until 48 hours has expired.

Plaintiff further states that this provision appears in the Tariff, which was introduced into evidence (Plaintiff's Exhibit Number Three), which states in substance: Where a trailer is spotted for loading by the consignor, or for unloading by the consignee, 48 hours' free time will be in effect. General Electric urges that this court follow that provision, and cites several cases upholding such a provision.

The case on which plaintiff primarily relies under circumstances that appear to be somewhat the same, is Red River Cotton Oil Co. v. Texas & P. Ry. Co., 216 La. 519, 44 So.2d 101 (1949), cert. denied, 339 U.S. 953, 70 S.Ct. 841, 94 L. Ed. 1366 (1950).

In that case, a quantity of copra was shipped from the Philippine Islands to New Orleans by steamship and from New Orleans to Alexandria, Louisiana, on the defendant's railroad. Upon arrival in Alexandria, the railroad cars were moved by defendant's engine onto a spur track maintained for exclusive use by plaintiff under a spur track agreement. Employees of plaintiff opened the gates and at their direction the cars were pushed into the mill enclosure and spotted on the tracks at the place designated by plaintiff's employees. All of this took place on a Sunday. At about 3:30 a. m. on Monday, a fire broke out

and the shipment of copra, still in the railroad cars, was destroyed. The free time for unloading, as provided for in the Bill of Lading, had not elapsed.

The court affirmed the holding of the trial court in favor of the plaintiff-consignee. The court's rationale was that the contract provided for a period of free time for unloading, and that during this time, the risk of loss was on the carrier.

The court relied primarily upon the terms of the contract and the decision of the Supreme Court in Michigan Central Railroad Co. v. Mark Owen & Co., 256 U.S. 427, 41 S.Ct. 554, 65 L.Ed. 1032 (1921). The dissenting opinion pointed out two weaknesses in the majority's reasoning: First, that the provision in the Bill of Lading providing for free time was not really applicable to the case, since it contemplates a situation where a loss occurs before delivery has been made; and second, *Michigan Central, supra,* is to be distinguished because there the railway cars were placed on a public siding, while in the case before the court, the cars were placed on a private siding. The dissent reasoned that in such a situation, the carrier could not have prevented the loss, since complete control had been relinquished to the consignee. This court finds the reasoning of the dissent most persuasive.

In United Firemen's Ins. Co. v. Thompson, 259 S.W.2d 612 (Tex.Civ. App.1953), the court expressly rejected the rationale of *Red River Cotton.* This court finds the reasoning of *United Firemen's* persuasive and that case is direct authority for the holding in this case. In *United Firemen's,* the defendant railroad placed two cars containing bales of cotton on plaintiff's private railroad siding. A fire occurred during the free time provided for in the Bill of Lading. The court held that the act of spotting the cars on plaintiff's private siding transferred custody and control of the cotton to the consignee, and so constituted a delivery. *See also* Trans-Cold Express, Inc. v. Hardin, 415 S.W.2d

431 (Tex.Civ.App.1967); Timber Structures, Inc. v. Southern Pacific Co., 237 Or. 42, 390 P.2d 343 (1964); Texas & New Orleans R. Co. v. Sparks, 290 S.W. 2d 936 (Tex.Civ.App.1956); Southern Advance Bag & Paper Co. v. Terminal R. Ass'n, 171 S.W.2d 107 (Mo.App. 1943); Queen Ins. Co. v. Galveston, H. & S. A. Ry. Co., 290 S.W. 286 (Tex.Civ. App.1927).

This court will, of course, first consider the liability of defendant, Acme, and then after that finding make observations in reference to the liability of Perry, if any, under the circumstances.

The court feels that the provision pointed out by counsel in plaintiff's Exhibit No. Three, namely, Part B, concerning the 48 hours' free time, is inapplicable in this case. *See Red River Cotton, supra,* 44 So.2d at 106 (dissenting opinion).

There have been a great many citations, and a very erudite brief by plaintiff's counsel, referring to the so-called free-time provision and the liability of the carrier as it has developed over the years and as it developed out of a hearing by the Interstate Commerce Commission back in 1919. Furthermore, the court is well aware of Michigan Central Railroad Co. v. Mark Owen & Co., *supra,* in which that provision was construed.

There, however, it was clearly indicated that the delivery was on a public delivery track, and the court cannot help but feel that in most of the cases cited by defendant, they apply to a fixed rail situation. *Cf.* Yazoo & Miss. R. R. v. Nichols & Co., 256 U.S. 540, 545, 41 S. Ct. 549, 65 L.Ed. 1081 (1921); Secretary of Agriculture v. United States, 347 U.S. 645, 647, 74 S.Ct. 826, 98 L.Ed. 1015 (1954).

Furthermore, these are cases in which the carrier had the capability of controlling the areas in which the delivery was made. Most of the instances apply to those situations where, with the exception of the *Red River Cotton* case, there was a public siding in the area of the rail yard and the consignee appeared

there to pick up the goods delivered at that siding. It is only the *Red River Cotton* case that goes as far as it does, where delivery was actually made to a consignee's siding in an enclosed area, that the rule has been applied at all and, as the court has indicated, the reasoning of that case is not persuasive.

■ It is hard to see how the reference in plaintiff's Exhibit Three, Supplement No. 179 to Tariff No. 231–D, affects liability. It would appear that it was principally designed to do just exactly what its title implies—set a tariff rate for containers for trailers which are delayed over a 48-hour period for loading and unloading in the possession of the consignor, so to speak, or in custody of the consignor, or consignee; and the court feels that the situation before us is one that demands a careful scrutiny of the common law as it applies to the facts of this case. In other words, the issue is whether there was a delivery, and the provisions of section 4(a) of the bill of lading are inapplicable in this particular instance.

The court feels that the plaintiff's contention, that he received no notification of intended delivery as he was entitled to, prior to tendering delivery at the General Electric warehouse in Baltimore, is not persuasive in this instance because of the facts which are stipulated; and the court finds that there was an actual presentation of these goods at the General Electric warehouse despite any controversy which might have occurred in connection with the actual acceptance of the goods at that time.

■ The fact is, and the court so finds from the stipulations and from the little testimony that was offered—and the court notes that it was unnecessary that any be offered—that the supervisor, the *controlling employee* at General Electric's warehouse did accept the trailer and did exercise dominion over it in that he directed the Perry driver and had one of his employees, Rye, the receiving clerk, assist in breaking the seal on the doors, removing the pin, and

making fast the doors and backing the trailer up flush with the sides of the overhead doors so that no one from the outside could have access to the trailer, and so that the plaintiff's employees could proceed with the unloading early Monday morning.

And Mr. Leonard, a General Electric employee, who took the stand in order to identify certain photographs that were taken, the relevancy of which might be questionable, but which certainly have no bearing on the outcome of this case, was asked certain questions in reference to what he intended to do, and he said that he intended to have General Electric employees come in early and unload the stereos.

Therefore, it would appear that this case falls into that category of cases which was referred to by the third party defendant as to a delivery where the exercise of dominion over the goods by the consignee obtained. One such case is United Fruit Co. v. N. Y. & Balto. Trans. Co., 104 Md. 567, 65 A. 415 (1906), where certain cargo was unloaded on defendant's wharf. *See also* General Amer. Transp. Co. v. Indiana Harbor Belt R. R., 191 F.2d 865 (7th Cir. 1951), cert. denied, 343 U.S. 905, 72 S. Ct. 636, 96 L.Ed. 1324 (1952); Republic Carloading & Distrib. Co. v. Missouri Pacific R. Co., 302 F.2d 381 (8th Cir. 1962); Southern Advance Bag & Paper Co. v. Terminal R. Ass'n, *supra.* It might be a different situation today in view of the 1919 action by the I.C.C., but, certainly, the facts would indicate that there had been that dominion exercised over the goods by the consignee.

There are numerous cases which counsel have cited which apply this principle of acceptance by the consignee, but I think that the cases most pertinent and *in point under the circumstances* are those cases which decline to follow the *Red River Cotton* case; for example, United Firemen's Ins. Co. v. Thompson, *supra,* wherein a rail car containing cotton was placed the the consignee's private siding and the cargo was destroyed

by fire during the free time allowed and before the seals were broken.

These cases support the rationale of such a holding as I am making here today, namely, that where a consignment of goods is delivered to a consignee and he, in effect, has custody and is capable of control over a given area, then he accepts the delivery and is liable for any loss which might occur.

Here, these goods were delivered to General Electric at its warehouse in Baltimore, Maryland. They were accepted, the trailer was backed up, and, as I have repeatedly said, dominion was exercised over them, not so much for the benefit of the carrier, but for the benefit of the consignee.

Whatever rights could be assigned by virtue of the fact that plaintiff's employee protested the acceptance, the fact remains that he did accept the goods and he had the right, of course, under the circumstances, to tell the carrier that he would not accept the goods until Monday morning and require that they be returned and, certainly, in that instance the carrier would have been liable for any loss that might have occurred.

But all of the indicia of acceptance of delivery were exercised here—backing up the trailer and fixing it in a position where the plaintiff's employees could unload it—and arrangements were even made to call Perry upon the completion of the unloading and have the tractor come and take the trailer back to the rail yards for return to Acme. *See* Robertson v. Louisiana Fruit Gr. Ass'n, 80 So.2d 190 (La.App.1955).

The court makes a finding that defendant has no liability, under the circumstances, and the loss must be borne solely by General Electric Company because it had accepted delivery.

Insofar as the third party claim is concerned, the court feels that a finding for defendant, it it were necessary to do so, should be had—that is, if the case went forward and there were liability against Acme (which the court finds there is not)—for the reason that notice was given to Acme. There is a conflict as to how the delivery should be made, in that Acme's testimony indicates that Perry was directed to get a receipt, while testimony by Perry's driver disputes this claim. The contract between Acme and Perry provides that Perry is to obtain a receipt for the shipment from the consignee. However, the testimony shows that Acme consented to Perry's action, and the court finds that under the circumstances there was a waiver of Acme's contractual right to a delivery receipt. Thus, it would appear that delivery was a proper one and that there could be no right to indemnity over under those circumstances.